**Mary Kelley MIMMS,**
**Plaintiff–Appellant,**

v.

**Malcolm Lillard MIMMS, Sr.,**
**Defendant–Appellee.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 18, 1989.

Permission to Appeal Denied by Supreme Court Nov. 6, 1989.

John J. Hollins, J. Russell Heldman, Nashville, for plaintiff-appellant.

Jack Norman, Jr., Nashville, for defendant-appellee.

## OPINION

TODD, Presiding Judge.

In this divorce case the plaintiff, Mary Kelley Mimms, has appealed from a decree which grants the defendant-cross plaintiff, Malcolm L. Mimms, Sr., an absolute divorce, and custody of two minor children.

The plaintiff-cross defendant was awarded rehabilitative alimony of $1200 per month for one year, division of marital property and $10,000 attorney fees.

■ Appellant presents four issues for review, of which the first is as follows:

I. Whether the Trial Court erred in admitting into evidence the transcript of Mrs. Mimms' telephone conversation which was tape recorded by Mr. Mimms without her consent in violation of federal law prohibiting the interception or attempt to intercept wire or oral communications.

Appellant's brief asserts that the contents of a transcript of a telephone conversation was introduced over the strenuous objection of appellant. Appellant's citation to the record (I, pp. 138–139) does not support this assertion. The cited pages reflect that, during cross examination of appellant, she admitted a telephone conversation with an alleged paramour and was then asked:

Q. Well, did you tell Mr. Harris that you loved him?

Appellant's counsel objected after which the following occurred:

Mr. Norman: It was not a taped telephone conversation. It was not a phone tap, if the Court please.

Mr. Hollins: It's a recording of a phone conversation between this woman and somebody in Albuquerque.

The Court: Is it on an answering service?

Mr. Norman: No, Ma'am. It's Mr. Mimms listening to her side of the conversation. In other words, it's what he heard her saying on the telephone. It wasn't any phone tap.

Mr. Hollins: But it's the same thing. I mean—

It does not appear that the witness ever answered the above quoted question.

Appellant's brief cites no other portion evidencing the introduction of a transcript of a recording of a telephone conversation. However, at pages 482 and 483 of the transcript, the following is recorded:

Q. Now, then, we've gone all through the telephone taped conversation that you overheard and that you recorded....

Q. Now, let me ask you this though, Mr. Mimms. You did hear your wife admit that the tapes represented the conversation that she had?

A. Yes.

....

Mr. Norman: If the Court please, at this time, we would like to make the transcript an exhibit to Mr. Mimms' testimony.

Mr. Hollins: We object to that. Certainly Ms. Mimms was asked in living color every possible question and answer, and we still insist to the Court that this was made in violation of the federal law.

The Court: Well, I'd rather that it was, so I'm going to admit it. Mark it as the next exhibit, please.

(Said Transcript was marked as Exhibit No. 55 & received into evidence.)

Exhibit 55 is a 25 page document entitled "Transcript of Tape Recordings". It is authenticated as such by the Trial Judge.

No evidence is found that the recording represented by exhibit 55 was obtained by any tapping, connection or other electronic interception of a message being transmitted by radio or telephone. On the contrary, the evidence shows that the appellee actually eavesdropped by listening to and recording audible words of appellant spoken during a telephone conversation. The appellee took the stand and testified in pertinent part as follows:

The witness: She had pulled up a chair, an old chair, out in the garage next to the garage door. I had pulled—and she went back into the house. I go right inside the garage and open the window right by the garage, right directly over this chair. I take a tape recorder and put outside of the rock wall. She turned

all the lights off where she couldn't see anything, or where she could see anything that came along. I walked right up to the rock wall and took a stick when she got on the phone and talked to Mr.— to this gentleman, or when he called her back. She had made a phone call, another collect call, and asked someone, where have you been, I've been calling, blah-blah-blah. And I want to emphasize this. We're talking about late at night, okay? Prior to this, Holly Johnson had left. She said something about she was going, but she would be back.

The Court: So you're in the garage listening?

The witness: I'm right outside the garage. The window is four and a half feet from the edge of the wall where she was at.

The Court: Where you could hear her talking on the phone?

The witness: I can see her talking on the phone.

The Court: And you punched your recorder on.

The witness: I walked around a little lattice-work fence, turned the recorder on and took a stick and pushed it up where she had put a—and pushed the recorder up under that chair, a little wicker chair, and that there's two tapes, but there were two recorders. In frenzy over this conversation that I heard, and sat there, and I can't ever tell anybody how I felt, that I hope and pray I never have to say about it again, but I took another tape recorder—

The Court: Is this the recording?

The witness: That's going on.

The Court: Is this taking down what you actually heard with your own ears?

The witness: Yes, Ma'am. And then I take another recorder when this other one—about the time it was going out, and I push it, and I got so far with that other recorder, I pushed that recorder right up under this woman's ear. She lays the phone down. She lays the phone down, and that can be explained why she had to lay the phone down. She laid the phone down. I pushed it up under the chair this far, right up to the phone. And only God knows what I would have done if she had found it, that particular night, because this was one or two o'clock in the morning Your Honor.

The Court: But you were listening to it—

The witness: Yes, Ma'am, I'm listening to it and watching her.

The Court: This tape was recording her end of the conversation?

The witness: Yes, Ma'am.

The Court: It wasn't recording anybody else's?

The witness: No, Ma'am. The only time it may have picked up something was when I pushed the recorder up against the phone when she had it laying on the concrete floor.

. . . .

The Court: Well, it doesn't sound like an ordinary wire tap here. I'm going to let him cross examine. It seems to me this man can testify to what he heard her say.

Mr. Hollins: If he doesn't try to introduce the wire tap, I think that's—

The Court: I don't think its' a wire tap at this point.

Mr. Hollins: Well, it's a recording of an interstate telephone conversation. I guess the Court can listen to it—

The Court: It doesn't have all the parties to it. I'm going to read this, but I think you—

Mr. Hollins: No, it doesn't show the other parties, but I listened to the tape player, the two tapes.

The Court: I think you have to have two parties to get the wire tap.

The legal issue appears to be: where an interstate telephone conversation is in progress and a third party eavesdrops and records the audible conversation of only one of the participants, is the eavesdropper/recorder precluded from placing in evidence what he heard and recorded without any electronic disturbance or invasion of the telephone circuit in use at the time.

18 U.S.C. § 2515 provides in pertinent part as follows:

§ 2515. Prohibition of use as evidence of intercepted wire or oral communication

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2511 provides:

§ 2511. Interception and disclosure of wire or oral communications prohibited

(1) Except as otherwise specifically provided in this chapter any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

(ii) such device transmits communications by radio, or interferes with the transmission of such communication; or

(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 2510 provides:

§ 2510. Definitions

As used in this chapter—

(1) "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

(2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

. . . .

(4) "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any com-

ponent thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

In *U.S. v. McLeod*, C.A.Ind.1974, 493 F.2d 1186 it was held that, where an agent stood about four feet from the defendant while she placed her call on a public telephone and he heard without using any device, he did not intercept the call and the conversation was not subject to suppression.

In *People v. Siripongs*, Cal.1988, 247 Cal.Rptr. 729, 754 P.2d 1306, 45 Cal.3rd 548, it was held that an officer tape recording a telephone conversation which he overheard while standing next to a murder defendant did not constitute an illegal wiretap in that the officer did not "intercept" the conversation" through the use of any electronic, mechanical, or other device; rather that he heard the conversation with his normal hearing facilities and the tape recording merely memorialized what he heard.

■ A recording of a conversation is admissible to the same extent that testimony of such conversation would be admissible. 31A C.J.S. Evidence § 188.

In the present case, the wife was inside a garage at the family home and the husband was standing outside an open window where he could clearly hear by natural means that which was recorded.

A conversation carried on in a tone of voice audible to a person outside the enclosure is not private. *U.S. v. Llanes*, 2nd C.C.A.1968—398 F.2d 880.

The Federal Courts are not agreed as to the legality of a wiretap by a family member within a family home. It is unnecessary for this Court to attempt to reconcile, distinguish or select the preferable authority on this subject because there is no evidence of a wiretap.

It is true that the husband admitted that he pushed his recorder into close proximity with the telephone being used by his wife as she lay on the floor and that the recorder might have picked up a word spoken by a third party and transmitted to the telephone. However, the husband testified unequivocally and without contradiction that he heard all of the words in the transcription. The transcription has been examined, and none of it appears to be words of the third party.

The evidence does not show that any part of the transcription was the result of interception of an otherwise inaudible voice transmitted by telephone. On the contrary, it shows that the transcription is entirely what the husband heard naturally and could have related if his memory had been as perfect as the recording.

Appellant cites *United States v. McIntyre*, 9 C.C.A.1978, 582 F.2d 1221, wherein police officers were convicted of violating 18 U.S.C.A. § 2511 by placing a microphone and transmitter in a briefcase in a private office of an assistant chief of police in order to monitor conversations in the office. The appellate court held that the assistant chief of police had an "expectation of privacy" in his private office, and that the police action in "bugging" his office was illegal. In the present case, no police action is involved, and the eavesdropping and recording were done in a private home by a member of the family residing therein, and, most important, the recorded words were actually heard naturally by one present at the conversation. In the cited case there was no witness present to hear the recorded words.

*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), cited by appellant, was a 4th Amendment search and seizure case involving a "bugged" telephone booth in which it was held that the defendant had a Fourth Amendment "expectation of privacy" from electronic surveillance of his conversation. That case is not applicable because it involves govern-

mental officers and the fourth amendment which is inapplicable to actions of private citizens. 79 C.J.S. Searches and Seizures. § 5(c) p. 783. Moreover, Katz did not include the presence of a listener who had a right to be there.

This Court concludes that there was no error in the admission of testimony of the husband as to what he heard his wife say and the recording of the same information.

No merit is found in appellant's first issue.

■ Appellant's second issue is as follows:

II. Whether the Trial Court erred in awarding custody of the parties' minor children, ages 5 and 7, to Mr. Mimms.

At the time of the trial, the daughter of the parties was aged 5, and the son of the parties was aged 7.

Appellant first asserts:

... the proof ... shows that not only is Mr. Mimms unprepared to care for and nurture these small children, but also the actions and lifestyle of Mr. Mimms himself are far more deleterious to their welfare than any of the actions of Mrs. Mimms even if viewed in their worst possible light.

The factors of disqualification are cited as:

Age (59).

Frequently works late at night and on weekends.

No care of children for an extended time.

Agreement that the wife supervised the day-to-day activities of the children before trial.

Lack of close relationship with the children of a former marriage.

The necessity of hiring a person to care for the children while the husband works.

Possession of pornographic material.

Evidence (denied by the husband) that he has been having an affair with a 29 year old female.

Evidence of violence and threats of violence by husband toward wife.

The appellee-husband responds that, if he is shown to be an unfit custodian, the evidence shows the wife to be even less fitted to have custody of the children.

Evidence is cited of violent conduct toward the husband, and cursing in the presence of the children, consorting with other men, negligent housekeeping, and frequent activities outside the home, including out of town trips.

The husband cites his own activities for the welfare of the children including:

Providing a wholesome rural setting for their home.

Taking them on trips.

Providing schooling in a private school.

Willingness to maintain the present home environment of the children under wholesome supervision.

The Trial Judge found:

The Court finds the burden of proof has been carried by the defendant and counter complainant, Malcolm Mimms, Sr. Therefore he is hereby granted a divorce from the complainant wife upon the grounds of adultery. The Court further finds after hearing the testimony of the wife and considering all the evidence presented in the trial of this matter, that she is not a credible witness and is not believable under oath.

. . . .

Insofar as the custody of the two minor children are concerned, at this time it is found to be in their best interest and welfare that their custody be awarded to the natural father and husband, Malcolm Mimms, Sr. The Court finds the actions of the mother and her lifestyle is not conducive to the best interest and welfare of the children.

Absent some compelling reason otherwise, considerable weight must be given to the judgment of a trial court in a divorce proceeding in respect to the credibility of the parties and their suitability as custodians. *Bush v. Bush,* Tenn.App.1984, 684 S.W.2d 89.

The trial courts are vested with a wide discretion in matters of child custody, and the reviewing courts will not interfere ex-

cept upon a showing of erroneous exercise of that discretion. *Grant v. Grant,* 39 Tenn.App. 539, 286 S.W.2d 349 (1956).

▉ Appellant cites authorities wherein children were left in the custody of their mother despite her indiscretions. It is true that sexual infidelity or indiscretion does not ipso facto disqualify a parent from receiving custody of children. However, when the activities of a parent involve neglect of the children, such neglect may be considered in relation to the best interests of the children.

Moreover, the opportunity of the trial court to see, hear and evaluate the parents creates a substantial advantage to the trial court over the appellate courts in wise adjudication of custody.

Both the Trial Court and this Court can take comfort in the fact that custody orders are not engraved in stone but remain subject to change "as the exigencies of the case may require". T.C.A. § 36–6–101. Therefore, if at any time it should develop that the custody of the father is not for the best interest of the children, the Trial Court retains the power and duty to make such provision for the care and custody of the children as the facts and their welfare require.

No merit is found in appellant's second issue.

▉ Appellant's third issue is as follows:

III. Whether the Trial Court erred in awarding Mrs. Mimms only "rehabilitative" alimony in the amount of $1200 a month for one year.

In dividing the marital estate, the Trial Court awarded to the appellant the following:

Selected household goods $28,240

Jewelry and furs $17,770

Automobile

Livestock and equipment $30,950

One half of proceeds of 20 beef cattle

$175,000.00 in cash

The wife retained as her separate property a farm in Maury County.

In addition to the $1200 monthly alimony, $10,000 was awarded to the wife as part of the fee of her attorney.

Appellant argues that she is "incapable of becoming an effective wage earner." At the time of the trial, appellant was 36 years old. No evidence is found of any disability except that she has been a home maker and hasn't been in public work for 8 years. There is evidence that the husband supported her generously during their marriage.

Appellant argues that her total dependence for 8 years and the financial ability of her husband warrant a finding of "relative economic disadvantage" and "infeasible rehabilitation" such as to require "support on a long-term basis". *Franklin v. Franklin,* Tenn.App.1987, 746 S.W.2d 715, cited by appellant is not applicable because in that case the divorce was granted to the wife because of the fault of the husband. In the present case, the divorce was granted to the husband for the fault of the wife, and no issue is made as to this disposition. The statute does not require the wronged spouse to continue to support the guilty spouse after the divorce in the generous manner in which support was provided before the divorce.

Appellant relies upon an exhibit which lists $4,738 "monthly expenses of wife and children". Since the custody of the children has been committed to the husband, this estimate of expenses is inapplicable. No evidence is cited or found as to the reasonable subsistence requirements of appellant independent and separate from those of the children.

After considering all of the factors listed in T.C.A. § 36–5–101(d) to the extent possible within the evidence in this record, this Court is unable to hold that the Trial Court erred in fixing the amount or duration of alimony.

No merit is found in appellant's third issue.

Appellant's fourth issue relates to the amount of child support which should be paid by the husband if custody of the children were committed to the wife. Such an order of custody has not been made by the

Trial Court, and no such order is being made by this Court. Therefore, the fourth issue is moot.

No error is found in the judgment of the Trial Court which is affirmed. Costs of this appeal are taxed against appellant. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

LEWIS and CANTRELL, JJ., concur.