IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE
_____

**CARL WILLIAM STROUD, JR.,**

    Plaintiff-Appellee,

                                          Giles Chancery No. 8611

Vs.                                    C.A. No. 01A01-9607-CH-00291

**SANDRA FAYE STROUD,**

    Defendant-Appellant.

FROM THE GILES COUNTY CHANCERY COURT
THE HONORABLE JIM T. HAMILTON, CHANCELLOR

Paul Bates; Boston, Bates & Holt of Lawrenceburg
For Appellee

Robert D. Massey of Pulaski
For Appellant

*VACATED AND REMANDED*

Opinion filed:



**FILED**

**May 21, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

                                    **W. FRANK CRAWFORD,**
                                    **PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**HOLLY KIRBY LILLARD, JUDGE**

      This is a child custody case. Defendant, Sandra Faye Stroud (Mother), appeals from the

order of the trial court granting the petition to change custody filed by the plaintiff, Carl William

Stroud, Jr. (Father).

The parties were divorced by final decree entered July 11, 1994. The trial court granted Mother an absolute divorce from Father on the grounds of inappropriate marital conduct and granted Mother custody of the parties' minor child, Heath Elvin Stroud. At the time, Heath Stroud was three years old. The trial court ordered Father to pay $65.00 per week in child support, but reserved judgment on visitation privileges for Father.

On July 12, 1995, Father filed a petition seeking to change custody from Mother to Father. In the petition, Father alleges that Mother contacted him in May of 1995 because she could not discipline Heath, and as a result, Heath lived with Father from May 1995 until July 9, 1995. Father alleges that Heath had repetitive sinus infections and terrible dental problems and was unruly with no social skills, but that Heath underwent a complete turnaround during the time he lived with Father. Father alleges that there has been a material change in circumstances and that the best interests of Heath dictate a change in custody.

On July 19 and 20, 1995, the trial court held a pendente lite hearing and heard the following evidence:

Father is an admitted alcoholic, but quit drinking five months before the pendente lite hearing. Father has not paid the complete amount of the ordered child support, but he entered into an agreement with Mother concerning the arrearage allowing her to apply his share of the marital property to the arrearage. Father lives out of wedlock with his girlfriend, Elsie Bowles, in Morristown, Tennessee. Father is an automobile mechanic in Morristown making $250.00 per week.

Father testified that Mother called him because Heath was unruly and needed some guidance. Heath lived with Father from May 1995 until July 1995 in Morristown. Father testified that Heath had dental problems and frequent nose bleeds. He stated the Heath was unruly, timid, and scared of policemen when he first moved to Morristown. In Morristown, Heath has his own bedroom. Father testified that Mother's house was "nasty" and that she had a rat problem. He stated that she has sewage running in the front yard and that Mother is unfit to have custody of Heath because of the condition of her house. However, he admitted that the house was in the same condition when he lived there. He testified that Mother lived with her boyfriend and that they slept together in the same bed.

Father presented evidence that impeached Mother's credibility and corroborated his own

testimony. Seth Doty, a former employer of Mother, testified that Mother was a manager of rental properties for his company for three years. Doty stated that Mother collected $1,700.00 in rental charges and did not turn it in to the company. He stated that Mother was not truthful with him or with her tenants and that she kept the tenants' deposits.

Elsie Bowles, Father's girlfriend, testified that Father has not had a drink in five months and that he is now a hardworking man. She stated that she stays at home and takes care of the children, including her eighteen-year-old son who has cerebral palsy. Ms. Bowles testified that when Heath lived with them from May to July 1995, he had poor manners and misbehaved and that when he left, he was a well-liked, well-disciplined child. She admitted that Father lives in her home, that she has the power to kick him out at any time, and that Father would have a hard time taking care of Heath if she kicked him out of her home. However, she testified that she would call Mother if Father ever left her home or if she ever made Father leave her home. She claims that she and Father would like to be married, but that if they got married she would no longer receive social security checks to pay for the care of her disabled son.

Father entered a videotape into evidence that he claimed he found in a dresser drawer of the bedroom suite after he moved from Pulaski, Tennessee to Morristown. Father testified that he did not make the tape and did not know of its existence prior to the divorce. On the other hand, Mother testified that Father filmed the videotape and that he was drinking at the time. She claims that he indicated what he wanted her to do, but that his voice never is heard on the videotape. She said that he kept the videotape in his underwear drawer in their dresser in the bedroom. She also stated that Father threatened her with the tape. She claims that Heath was never present during the filming of the video, but that he walked through the room once and was in another room. However, she stated that Heath has never seen her engage in any lewd behavior.

Mother lives in Pulaski, Tennessee and, at the time of the pendente lite hearing, worked third-shift at a plant, which required her to place Heath in child care from 10:30 p.m. until 12:00 p.m. the next day. She testified that Heath was well-adjusted at the child care center and never used foul language. Mother admitted that her boyfriend stays overnight approximately once a week while Heath is there, but she said her boyfriend was not a regular in the house. Mother

testified that she has wet weather springs in her yard, but not a sewage problem. She also testified that she does not have a rat problem, but that she lives next to open fields and one time had a field mouse in her home.

Mother testified that the reason she let Heath live with Father from May until July 1995 was because Father was supposed to enroll Heath in a summer camp. However, Heath never attended camp. When Father would not return Heath to Mother's custody, she had a custodial interference warrant issued against him.

Mother testified that Father threatened her with a gun in front of Heath and physically assaulted her. Because of this incident, she had an aggravated assault warrant issued against him.

Mother presented testimony that she was a loving mother and that Heath was happy and in good health. She presented evidence that Heath was healthy and had normal teeth. Michelle Chapman, Heath's day care owner, testified that Heath was a normal child who had no disciplinary problems. Mother also called her son-in-law, Bobby Ables, who testified that Father told him that he (Father) made the videotape of Mother and asked Ables if he wanted to see it. Ables testified that Heath was a normal child and that Mother's house was clean. Angela Ables, Bobby Ables's wife and Mother's daughter, testified that Father knew of the videotape before the divorce and used it to threaten Mother.

After the pendente lite hearing, the trial court determined that Mother had credibility problems. The trial court also found that Mother was working third-shift and was only with Heath from noon until 10:00 p.m. five or six days per week and that Heath spent some nights away from home. The trial court also stated that it was impressed with Father's rehabilitation from alcohol abuse. The trial court concluded that Heath's best interests dictated an award of temporary custody to Father and found that the "totality of the evidence demonstrated clear and convincing evidence that a change of circumstances has occurred."

On September 22, 1995, Mother filed an answer that denied the material allegations of the petition. Mother claims that she let Heath live with Father from May 1995 until July 9, 1995 so that Father could reestablish a relationship with Heath. She alleges that Father used lies and trickery to obtain her consent and that Father used this time with Heath to gain permanent custody. She argues that Father has unclean hands and cannot recover. In addition, Mother

4

alleges that Father is living with and is supported by a woman to whom he is not married and that this situation would have an adverse effect on Heath. Finally, Mother avers that a videotape that Father offered into evidence had been altered and had portions deleted. She alleges that Father represented to the court that he did not make the tape and did not know of its existence before the divorce. However, Mother claims that Father filmed the tape prior to the divorce.

The case was heard before the chancery court, sitting without a jury, on October 9, 1995. The trial court considered the testimony from the pendente lite hearing and also heard new evidence:

James Dennis Mooney, senior vice-president at Third National Bank, testified on behalf of Mother. He stated that she had a very good reputation in the community for telling the truth. He admitted that he only knew her through banking activities and did not know her socially.

Dr. Charles Burger, Heath's doctor in Pulaski, stated that Heath was in normal health with normal hygiene. He had no reservations about Mother being the primary custodial parent.

J.O. Scroggin, Jr. testified that he employed Mother as a secretary and bookkeeper for his real estate business and that she had a good reputation for telling the truth. However, Scroggin stated that Mother quit her job with his company after a disagreement about Mother's competing rental properties.

Phyllis Morrow Stroud, Father's previous wife, testified that she saw Father drunk in June 1995 and that Father told her in June 1994 that he had a videotape that would help him get Heath. Pamela Pridmore, Father's stepdaughter, testified that Father told her that he had raped Mother, that Father told her he made the videotape, that Father said the videotape was his insurance policy and his blackmail material, and that Father had shown the videotape to her husband and her brother. She said that she heard Father's voice on the videotape. She also stated that she has seen Father smoke marijuana.

Ron Pridmore, Pamela Pridmore's husband, testified that Father showed him the videotape and that Father appeared on the videotape "playing with hisself [sic] in the bathroom." He stated that Father's voice was on the tape and that Father told him he was going to use the videotape to get custody of Heath.

Mother testified again at trial and stated that her work shift had changed to second-shift, which is 4:00 p.m. to 12:30 a.m. She also testified that Father had criminal convictions for DUI

5

and public intoxication and that Father served seven years in prison for stealing cars. She admitted that Heath's bed is in her bedroom and that her boyfriend stays with her while Heath is asleep in the same room. She also admitted that she had never taken Heath to the dentist.

The trial court granted Father's motion and changed custody from Mother to Father. In its order, the trial court stated, "[B]ased upon the court's observation of the demeanor of the witness, the court has re-concluded that the defendant, Sandra Faye Stroud, has considerable credibility problems. The court affirmatively finds that the video tape previously introduced as evidence in this cause was made by the defendant, Sandra Faye Stroud, in the absence of Carl William Stroud, Jr." The trial court then said, "The court re-emphasizes its favorable impression with the petitioner, Carl William Stroud, Jr., with regard to his having rehabilitated himself as well as his credibility." The trial court awarded permanent custody of Heath to Father and awarded reasonable visitation to Mother. The trial court did not order child support payments.

Mother appeals the judgment of the trial court and presents one issue for our review: Whether the trial court erred by changing the custody of the parties' minor child from Mother to Father.

Our review of the findings of fact by the trial court is de novo upon the record, accompanied by a presumption of the correctness of the trial court's findings. Unless we find that the evidence preponderates against these findings, we must affirm, absent error of law. T.R.A.P. 13(d). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *Mays v. Brighton Bank*, 832 S.W.2d 347, 351-52 (Tenn. App. 1992). The weight, faith, and credit to be given to any witness's testimony lie in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*. at 352.

It is well-settled in this state that where a decree has been entered awarding custody of a child, that decree is *res judicata* and conclusive in a subsequent application to change custody unless there has been a material change of circumstances such that the welfare of the child requires a change of custody. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn. App. 1995) (citing *Long v. Long*, 488 S.W.2d 729 (Tenn. App. 1972)). There is no hard and fast rule as to what constitutes changed circumstances. *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. App.

6

1983).  In *Wall v. Wall*, 907 S.W.2d 829 (Tenn. App. 1995), this Court discussed "changed circumstances":

> When two people join in conceiving a child, they select that child's natural parents.  When they decide to separate and divorce, they give up the privilege of jointly rearing the child, and the divorce court must decide  which parent will have primary responsibility for rearing the child.  This decision of the Court is not changeable except for "change of circumstances" which is defined as that which requires a change to prevent substantial harm to the child.  Custody is not changed for the welfare or pleasure of either parent or to punish either parent, but to preserve the welfare of the child.  Custody is not changed because one parent is able to furnish a more commodious or pleasant environment than the other, but where continuation of the adjudicated custody will substantially harm the child.

*Id*. at 834.

The party seeking a change in custody has the burden of proving by the preponderance of the evidence that a change in custody is in the child's best interest.  *Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. App. 1991).  In child custody cases, the welfare and best interest of the child is the paramount concern and the determination of the child's best interest must turn on the particular facts of each case.  *In re Parsons*, 914 S.W.2d at 893.  In *Holloway v. Bradley*, 230 S.W.2d 1003 (Tenn. 1950), the Court said:

> The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next.  The supreme rule to which all others should yield is the welfare and best interest of the child.

*Id*. at 1006.  In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983), the Court established some guidelines for determining the best interest of a child:

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness."  The paramount concern in child custody cases is the welfare and best interest of the child.  *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. App. 1972).  There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>
> > Fitness for custodial responsibilities is *largely a comparative matter*.  No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian.  Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

> *Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn. App. 1973)
> (emphasis supplied.)

*Bah*, 668 S.W.2d at 666.

Mother first argues that Father came into the court with "unclean hands," and therefore, the trial court should have rejected his petition. The doctrine of "unclean hands" does not necessarily repel a petition regarding the welfare of a child because the welfare of the child predominates over any offended dignity of the court. *Haynes v. Haynes*, 904 S.W.2d 118, 120 (Tenn. App. 1995); *see also Strube v. Strube*, 379 S.W.2d 44, 48 (Tenn. App. 1963). We believe that the trial court properly allowed the hearing to proceed despite the allegations of "unclean hands."

Mother also asserts that the "tender years doctrine" is applicable in this cause. The General Assembly has addressed the "tender years doctrine":

> It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption in favor or against the award of custody to such party; provided, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

T.C.A. § 36-6-101(d) (1996). While the "tender years doctrine" is not a controlling factor, it is certainly something that should be considered by the court in making an award of custody. *Malone v. Malone*, 842 S.W.2d 621, 623 (Tenn. App. 1992). However, the court must still make an examination of the fitness of each party.

We believe that the central issue in this case is whether there has been a material change of circumstances such that the welfare of the child requires a change of custody. *See In re Parsons*, 914 S.W.2d at 893. Mother argues that there has been no material change in circumstances that would warrant a change in custody. Father argues that circumstances have changed in a material way concerning Mother's work schedule, Mother's new boyfriend, Mother's lack of control over Heath, and his own rehabilitation.

Father did not present testimony concerning Mother's work schedule at the time of the divorce, so we cannot tell how much Mother's work schedule has changed. However, by the time of trial, Mother was working second-shift instead of third-shift. If anything, her work schedule has improved.

Father also argues that Mother's new boyfriend presents a material change of circumstances. Mother admitted that her boyfriend spends the night at her home when Heath is present, but she denied that Heath has seen them engage in any sexual activity. Mother's cohabitation is troubling to this Court. However, Mother's cohabitation is only one of the factors to consider. *Musselman*, 826 S.W.2d at 922. We also note that Father lives with his girlfriend out of wedlock. We know of very few cases in this state where custody has been awarded to a parent living with a partner out of wedlock, and we believe that neither of these situations is ideal.

Father claims that Mother cannot control Heath and that she requested his help, a claim that Mother denies. Dr. Charles Burger, Heath's pediatrician, and Michelle Chapman, the supervisor at Heath's day care, testified that Heath was in good health and well-behaved. We do not believe that Father has shown a material change in circumstances on this issue.

Father also impressed the trial court with his rehabilitation from alcoholism. Although we believe that Father's rehabilitation is a factor to consider, like the "tender years doctrine," it is not a controlling factor. The fact that the non-custodial parent has improved himself or herself, standing alone, does not constitute such a change in circumstances that would warrant a change in custody. *Short v. Short*, No. 03A01-9506-CH-00168, 1995 WL 728521, at *2 (Tenn. App. Dec. 11, 1995). The main piece of evidence on which the parties and the trial court focused was the videotape. At the end of the proof, counsel for Father stated, "If she (Mother) had someone make that tape, she is an unfit mother. Anyone who would engage in that type of behavior is unfit. If Bill Stroud (Father) took the film of her, he's likewise unfit." It appears as if the trial court's decision was mainly based upon the credibility of the parties and the videotape. The trial court specifically found that Father did not make the videotape and that Mother was not credible.

The videotape shows Mother fondling and touching herself and is a shocking display of vulgarity. We cannot condone such conduct on the part of the participants in the taped production. However, we must disagree with the trial court's treatment of the videotape. In the first place, we conclude from our review of the record that the evidence preponderates against the trial court's finding that Father did not make the videotape. Heath appears in the tape and is obviously three years old or less, establishing that the tape was made while the parties were

9

still married. Although the trial court felt that Mother was not credible, the trial court did not comment on the parade of witnesses who testified that Father made the videotape, possessed the videotape before the divorce, and bragged about using the videotape as blackmail. In the second place, even if the trial court was correct in its conclusion that Father did not make the tape, the tape itself does not present a material change that affects Heath's well-being. While the tape shows Heath walking by the camera as Mother lifts her nightgown and also shows Heath bathing with Mother, there is nothing to indicate that he witnessed the vulgar activities depicted on the tape. Sexual infidelity or indiscretion does not ipso facto disqualify a parent from having custody of a child. *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. App. 1989). This Court has previously noted that we do not sit as moral arbiters making judgments on what is acceptable social behavior, but we must consider a parent's conduct to the extent that the interest of the child is concerned. *In re Parsons*, 914 S.W.2d at 894. Custody may be changed if the behavior of the custodial parent clearly posits a danger to the physical, mental, or emotional well-being of the child. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996). The tape in and of itself does not pose such a danger.

We reiterate that Heath's best interests are the primary concern of this Court and should also be the main focus of both Father and Mother. Unfortunately, their actions do not support such an intention. Neither parent has demonstrated a high degree of responsibility, nor have they shown that their interests are secondary to Heath's. They should understand that an alternative to parental custody is foster care if the interest of the child warrants such an action.

From our review of the record in this case, we find that the evidence preponderates against the trial court's finding that there has been a material change of circumstances that warrants a change in custody. Therefore, the order of the trial court changing custody is vacated, and the trial court shall order that Mother cannot permit any men friends to spend the night with her while Heath is in the home and shall in no way engage in any sexual activity while Heath is in the home.

We also are of the opinion that this case requires a close supervision by the court to protect the best interest of the minor child. This case is remanded to the trial court for instructions to refer this matter to the Tennessee Department of Human Services for full investigation of the living arrangements of both Mother and Father and all other facts pertaining

to their ability and willingness to care for the minor child.  The trial court shall also determine a visitation schedule for Father and shall require the Department of Human Services to monitor the custody and visitation arrangements for an extended period of time with periodic reports to the court.  Costs of the appeal are assessed against the appellee.

                                            _____

                                            **W. FRANK CRAWFORD,**
                                            **PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**HOLLY KIRBY LILLARD, JUDGE**