IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 13, 2002 Session

## FERRYL THERESITA McCLAIN v. RICHARD PERRY McCLAIN

Appeal from the Circuit Court for Sullivan County
No. C2697      John S. McLellan III, Judge

 **FILED MARCH 21, 2003** 

### No. E2002-00913-COA-R3-CV

This is a divorce case. The trial court dissolved the parties' marriage based upon a stipulated ground for divorce; divided the marital property; and awarded Richard Perry McClain ("Father") primary physical custody of the parties' two minor children. Ferryl Theresita McClain ("Mother") appeals the grant of custody to Father. In addition, she raises several procedural issues. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Leslie W. Bailey, Jr., Kingsport, Tennessee, for the appellant, Ferryl Theresita McClain.

Keith A. Hopson, Kingsport, Tennessee, for the appellee, Richard Perry McClain.

**OPINION**

I.

The parties were married on February 2, 1991. Two children were born to their union, Brett Aaron McClain (DOB: August 11, 1998) and Chase Ryan McClain (DOB: June 4, 2000). Mother was a licensed pharmacist, but she apparently did not work as such after the birth of the parties' first child. Mother and Father co-owned a computer information systems company. The company solicited contracts from large corporations to integrate their computer systems. Father did all of the hands-on work for the company, traveling to the various client sites. Mother assisted with the bookkeeping.

In April, 1999, following an argument between the parties as to whether Mother should travel to Ohio to see her brother's newborn baby, Mother withdrew $5,000 from the parties' joint bank account, and took eight-month-old Brett and drove to Ohio, without informing Father. Mother

contends that she and Father were having problems and that she "needed some time away from him to think." Mother left on a Friday and returned to Kingsport the following Monday.

Later that same month, Mother voluntarily admitted herself to Indian Path Pavilion Hospital, suffering from depression. As a part of her hospitalization, she sought help in coping with emotional issues associated with her marriage. She was evaluated by a psychiatric social worker who later testified at trial that Mother was not suicidal and that she posed no risk of harm to herself or to others.

On June 1, 1999, Mother filed for divorce on the ground of inappropriate marital conduct. A few months later, Mother learned that she was pregnant with the parties' second child. In November, 1999, at the parties' request, the trial court entered an order of reconciliation, which expressly suspended the divorce proceedings for six months. The parties' second child, Chase, was born the following June.

In July, 2000, the parties and their children went to Louisiana. The purpose of the trip was to attempt to reconcile Mother with her estranged father at a family reunion. While in Louisiana, the parties had several disagreements, which resulted in Mother leaving Louisiana with Chase and flying to Houston to stay with her sister and brother-in-law. Father returned to Kingsport with Brett. A week and a half later, Father flew to Houston with Brett. When the parties met in Houston, Mother told Father that she was taking the children and driving to her sister's house to spend the night. Mother assured Father that she and the children would return the next day at 1:00 p.m. Despite this understanding, Mother changed her mind, after deciding that she needed some time away from Father. Acting on the advice of her then-attorney, she withdrew $50,000 from the parties' joint bank account, took the children, and drove to Austin to stay with a friend. Mother did not contact Father to tell him she was taking this action. While Mother's sister and brother-in-law knew where Mother was, they were instructed by Mother not to tell Father.

Three weeks later, Mother returned to Houston with the children. During the entire three-week time period, Father had no idea where Mother and the children were. While she was away, Mother filed a motion to set aside the order of reconciliation. Father answered the divorce complaint and filed a counterclaim for divorce, which was also premised upon the ground of inappropriate marital conduct.

In September, 2000, the trial court held hearings for the sole purpose of determining a temporary parenting plan. At the conclusion of the hearings, the court entered an order on September 18, 2000, in which it named Father the temporary primary residential parent. The court based its decision on numerous factors, including Mother's health care philosophy,[1] the court's concern about Mother's mental well-being, and its concern about Mother secreting the children at

---

[1]Mother testified that she is a strong believer in the power of herbal medication and that she prefers to avoid administering antibiotics to the children when they are ill. On cross-examination, Mother admitted that she had not given Brett the antibiotics prescribed for him by a doctor to clear up an infection.

locations unknown to Father. Mother was granted visitation with the children every other weekend from 6:00 p.m. on Friday until 7:00 p.m. on Sunday, and on weekdays from 3:00 p.m. until 7:00 p.m.

A further hearing was conducted by the trial court in July, 2001. On July 31, 2001, the court entered a judgment of divorce, which granted the parties a divorce on a stipulated ground and divided the parties' marital property. The judgment also modified the visitation arrangement to reflect the fact that the older child was then in daycare. The court noted that Father remained the primary residential parent of the children.

In September, 2001, following another hearing, the court designated Father as the primary residential parent of the children, granted Mother certain visitation rights, and adopted Father's proposed parenting plan. The court's ruling was memorialized by a final order in December, 2001. Following the entry of that order, Mother filed a motion for a new trial, which she later amended. At the conclusion of a hearing on Mother's motion, the trial court denied the motion in full. This appeal followed.

II.

In this non-jury case, our review is *de novo* on the record of the proceedings below; however, the record comes to us accompanied by a presumption of correctness as to the trial court's factual findings, a presumption that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo* with no presumption of correctness. ***Jahn v. Jahn***, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); ***Bowman v. Bowman***, 836 S.W.2d 563, 567 (Tenn. Ct. App. 1991).

III.

Mother argues that the evidence preponderates against the trial court's designation of Father as the primary residential parent of the children. In support of her argument, Mother asserts that she has been the primary caregiver for the children since their respective births; that she is a good mother and is available during the daytime to care for the children; that she has done more to encourage a close parent-child relationship between the children and Father than Father has done to encourage their relationship with her; and that, prior to the parties' separation, Father's work schedule prevented him from spending much time with the children.

A trial court has broad discretion regarding a custody determination. ***Brumit v. Brumit***, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997); ***Varley v. Varley***, 934 S.W.2d 659, 665 (Tenn. Ct. App. 1996); ***Marmino v. Marmino***, 34 Tenn. App. 352, 355, 238 S.W.2d 105, 107 (1950). We will not disturb such a determination unless the record reflects an "erroneous exercise of that discretion."

*Mimms v. Mimms*, 780 S.W.2d 739, 744-45 (Tenn. Ct. App. 1989). "Absent some compelling reason otherwise, considerable weight must be given to the judgment of a trial court in a divorce proceeding in respect to the credibility of the parties and their suitability as custodians." *Id.* at 744.

There are "[n]o hard and fast rules . . . for determining which custody and visitation arrangement will best serve a child's needs." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). A custody determination is "factually driven" and "requires the courts to carefully weigh numerous considerations." *Id.* The overriding consideration is the best interest of the child. *Id.*

The factors a trial court must consider in determining the custody of children, to the extent that they are pertinent in a given case, are set forth in Tenn. Code Ann. § 36-6-106 (2001), which provides, in pertinent part, as follows:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:
>
> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . .
>
> (4) The stability of the family unit of the parents;
>
> (5) The mental and physical health of the parents;
>
> (6) The home, school and community record of the child;
>
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In the September, 2001, hearing, the trial court, in determining the issue of custody, found as follows:

> You know, looking at the factors under [Tenn. Code Ann. §] 36-6-106 again, one, as far as love and affection between the parents and children, that's equal; Number 2, disposition of the parents to provide the child with food, clothing, medical care, education, et cetera, I feel under the proof here today that's equal; Number 3, and I guess this goes to [the social worker's] testimony, importance of a continuity in a child's life in the length of time the child has lived in a stable satisfactory environment. And [the social worker] has testified that the children are profiting well under this and have become used to the routine that's currently set. Item 4, the stability of the family unit of the parents. Of course living here in Kingsport, [Father] has more of a family unit here in place as [Mother's] family is primarily in other state – or states. Item 5, the mental and physical health of the parents. Physical health as far as I know is relatively equal and, as I said, [Mother] is improved in regard to her mental well-being although I – you know, I have concerns as I've previously stated. So I think that would weigh in favor of [Father]. Item 6 would not be applicable; 7 would not be applicable, that's preference; Number 8, I don't find any physical or emotional abuse to the children or under the current circumstances of parent to parent. Number 9, we don't have any third parties who would frequent the home that I think would be harmful to these children, it would not be applicable.
>
> Number 10 I think is a factor that – "Each parent's past and potential for future performance of parenting responsibilities including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent/child relationship between the child and the other parent consistent with the best interest of the child." I think that factor weighs in – in favor of [Father]. I think [Father's] proposal in offering joint decision making on items of

education, non-emergency health and religion as opposed to that of [Mother] is – is a sign that fits within Number 10. And – and I tried to give him a chance to opt out of that by my questioning of him but he didn't. And I guess in his mind he – he feels like [Mother] and [Father] can deal with each other on these issues and try to reach a joint decision. So he didn't back out on that so I – to me that is a reaffirmation of his verification on his proposal and indicates a – an intent to share as best as possible the – the parenting of these children.

In reviewing both parenting plans in detail for the reasons I've stated and the findings I've made on the factors of [Tenn. Code Ann. §] 36-6-106 I designate [Father] as primary residential parent and I am going to execute the proposed parenting plan presented to the Court by [Father].

After evaluating the evidence before us, we do not find that the evidence preponderates against the trial court's designation of Father as the primary residential parent of the children. The trial court weighed the evidence against all of the pertinent factors set forth in Tenn. Code Ann. § 36-6-106. We find no abuse of discretion in the trial court's custody determination.

IV.

Mother raises four procedural issues for our consideration. First, Mother argues that the trial court erred in stating from the bench that Mother's motion for new trial, as later amended, was not timely filed as to the trial court's orders of September 18, 2000 and July 31, 2001. We believe that Mother has misinterpreted the trial court's remarks.

Following the September, 2000, hearings in the instant case, the court entered an order on September 18, 2000, in which it designated Father as the *temporary* primary residential parent. In July, 2001, the court entered an order granting the parties a divorce and decreeing that Father would continue to have *temporary* custody of the children. The trial court made its final decision naming Father as the primary residential parent at the conclusion of another hearing in September, 2001, which decision was memorialized by an order dated December 20, 2001. Following the entry of this order, Mother filed her motion for new trial, in which she primarily challenged the court's decision with respect to custody. In doing so, she cites to testimony from the hearings in September, 2000, and July, 2001.

At the hearing on Mother's motion, the trial court determined that Mother's motion, as it related to the hearings in September, 2000, and July, 2001, was not timely filed. On appeal, Mother argues that she could not have filed her motion until a final order was entered in the case, which did not occur until December, 2001. Therefore, she reasons, her motion as to all of the court's prior orders was timely filed.

As previously noted, we believe that Mother has misinterpreted the trial court's use of the word "timely." We agree with Mother that her motion was timely filed under Tenn. R. Civ. P. 59.02, which requires that a motion for new trial be filed within 30 days after the entry of judgment. However, Mother's motion with respect to the earlier court orders was not "timely" in the sense that it attacked court decrees pertaining to who would serve as primary residential parent of the children pending he further order of the court. The challenged September, 2000, and July, 2001, orders related to temporary custody. Once the court made its ultimate decision awarding primary residential parent status to Father, Mother's challenge of the prior orders, as they pertained to temporary custody during *past* periods of time, was rendered moot. In that sense, Mother's motion was not "timely." A trial court cannot "unscramble" a "scrambled egg." It is clear to us that the trial court fully considered Mother's motion to the extent that it challenged the court's ultimate decision to designate Father as the primary residential parent. We find no error in the court's judgment denying Mother's motion for new trial.

Next, Mother argues that the trial court erred in failing to make a written finding of the alleged emotional abuse inflicted upon her by Father. Tenn. Code Ann. § 36-6-106(a)(8) provides that a trial court, in making a custody determination, should consider "[e]vidence of physical or emotional abuse . . . to the other parent . . . . The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto." In the instant case, Mother offered testimony that Father had been emotionally abusive toward her. This testimony primarily related to alleged instances of Father yelling at Mother and making unreasonable demands upon Mother. The trial court did not make a *written* finding as to this alleged emotional abuse. However, in delivering its oral ruling from the bench at the conclusion of the September, 2001, hearing, the trial court stated as follows:

> Number 8, I don't find any physical or emotional abuse to the children or under the current circumstances of parent to parent.

While the court did not incorporate this finding into a written and filed memorandum, order, or judgment, it clearly considered Mother's testimony on emotional abuse and determined that there was no such abuse. The failure of the trial court to reduce its finding to the written form was contrary to the edict of the statute; however, the trial court's failure does not amount to reversible error. *See* Tenn. R. App. P. 36(b). The error was harmless.

Mother next contends that the trial court erred "when it characterized, as 'kidnapping', Mother's behavior of taking the two minor children of the parties with her for a visit with a friend in Austin, Texas without informing Father of where she and the children were." Mother asserts that, under Tennessee criminal law, her actions do not constitute kidnaping.

In the September, 2001 hearing, the trial court made the following remarks concerning Mother's sequestration of the children in Texas:

I think what remains of concern to the Court, and this is over this whole series of hearings, is that in listening to [Mother's] response under examination of – concerning the situation where she left with the children and I know she blames that primarily on her attorney at that time and says she was acting under his advise [sic] when she took the $50,000 and left the state. And – and basically [Mother], with the aid of her parents and relatives there, in essence sequestered [the children] until [Father] was finally able to negotiate in to be able to see his children and things. That – that still gives me a lot of concern because I wasn't satisfied with [Mother's] answer today in response to counsel's questions. I don't know that if – although, as I said, [Mother's] improved and coping with these problems, if this gets to be overwhelming because of pressure having children around or financial pressures or other pressures that will come about with both these folks as they move on with their lives that – whether – whether [Mother] would continue to be able to cope. So that is a concern. Because that kind of activity to me even if you say 'Counsel advised me' is very irrational, is very punitive to the – the [Father]. It amounts to a kidnaping and – you know, I mean all kinds of things come in your mind. It's just a very traumatic thing and I – I think – and when you're considering your attorney's advise [sic] you have to use your own judgment. And although I know you were under stress at that time and I guess in essence weren't thinking clearly, if I boil down your testimony. But I think this demonstrates at least a propensity at one occasion and I don't know that I don't see a little of that now – maybe not to facilitate a – as best a relationship with the other parent – between these children and the other parent under all the circumstances of you all being separated and having to share time.

While Mother's behavior in secreting the children from Father for three weeks may not have amounted to the criminal act of kidnaping under Tennessee law, it nonetheless was conduct that deprived Father of access to his children. While the trial court's use of the word "kidnaping" may have been technically incorrect, such does not amount to reversible error. When placed in context, it is clear that the trial court was greatly concerned about Mother's conduct in secreting the children from Father and it was this concern that partially motivated the court's award of custody to Father. Furthermore, Mother's behavior, as alluded to by the court, evidenced a lack of willingness to facilitate a close and continuing relationship between the children and Father. *See* Tenn. Code Ann. § 36-6-106(a)(10). Mother's argument directed at the court's choice of words in this case is merely an exercise in semantics, and, as previously stated, we find no reversible error in the court's reference. *See* Tenn. R. App. P. 36(b).

Finally, Mother argues that the trial court erred in its decision to discredit the testimony of Mother's expert witness because the expert did not interview both Mother and Father. We disagree.

-8-

In the initial hearings in this case, Mother offered the testimony of an expert witness, Judy Millington, Ph.D. Dr. Millington, a licensed psychologist, performed a psychological evaluation of Mother a few days before the first hearing; Dr. Millington never met with or evaluated Father. At the conclusion of these initial hearings, the trial court, in naming Father the temporary primary residential parent, stated as follows:

> I give very little credit . . . to Dr. Millington's opinion, in that she did not interview both parents and really got one side of the story, and it's always my philosophy at least that when we have these type evaluations that the doctor should evaluate both parents, and in other cases, the children are too young here, probably the children.

This court has held that "[e]xpert testimony is not ordinarily conclusive, but is purely advisory in character, and the trier of fact may place whatever weight it chooses upon such testimony and may retract it if it finds that it is inconsistent with the facts or otherwise unreasonable." *England v. Burns Stone Co.*, 874 S.W.2d 32, 38 (Tenn. Ct. App. 1993) (citing *Gibson v. Ferguson*, 562 S.W.2d 188, 189-90 (Tenn. 1976). "Even when no opposing expert testimony is offered, the trier of facts is still bound to decide the issue upon its own fair judgment assisted by expert testimony." *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991) (citing *Gibson*, 562 S.W.2d at 190.) There is nothing in the record before us to indicate that the trial court was incorrect, as a matter of law, in discrediting the opinion of Dr. Millington. Clearly the court, in its discretion as the trier of fact, could choose to disregard the expert's testimony. We therefore find no error in the trial court's decision with respect to the opinion of Dr. Millington.

V.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Ferryl Theresita McClain.

_____
CHARLES D. SUSANO, JR., JUDGE