Kenneth HODSON

v.

Karla GRIFFIN.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

May 24, 2006 Session.

June 13, 2006.

Permission to Appeal Denied by
Supreme Court Oct. 30, 2006.

Edward Kershaw, Greeneville, Tennessee, for the appellant Kenneth Hodson.

Karla Griffin, Morristown, Tennessee, appearing pro se.

**OPINION**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

In this custody case, Father argues that the trial court erred in awarding Mother primary parental responsibility of the parties' minor child. Father contends that the trial court's decision was based on the "tender years doctrine," which presumed that a child of a very young age should be placed with its mother. Father notes that the "tender years doctrine" is no longer applicable in Tennessee and contends that, because of her efforts to thwart his relationship with the child, Mother should not have been awarded primary parenting responsibility. We determine that there is no evidence that the trial court applied the "tender years doctrine" in this case. We further determine that the evidence does not preponderate against the trial court's finding that Mother has repented of her prior attempts to interfere with the relationship between Father and the child, and we find that the evidence otherwise supports the trial court's award of primary parental responsibility to Mother. Accordingly, we affirm the judgment of the trial court.

## I. Background

The parties in this matter, Karla Griffin and Kenneth Hodson, are the unwed biological parents of Kyler James Griffin–Hodson who was born on January 11, 2005. At that time, Mother was 32 years of age, had been married and divorced three times, and had two other children, aged 3 and 10. Father was 23 years of age at the time of Kyler's birth, had not been married previously, and had no other children. The parties were involved in a sexual relationship for an undisclosed period of time;

however, at the time of Kyler's birth, the parties were estranged.

Less than a month after the child's birth, Father filed a "Petition for Custody and Immediate Petition for Paternity/Legitimation" requesting, among other things, that paternity testing be conducted and, upon confirmation of his paternity, that the child's name be changed from Kyler James Griffin to Kyler James Hodson. The petition further stated that "Father would also like an immediate court hearing so that he can get primary parentage of Kyler James Griffin with appropriate visitation to Mother." The petition includes allegations that "Mother has cursed Father on the telephone and explained to him that he could forget any involvement in his own child's life." In response, Mother filed a counter petition requesting, *inter alia*, that she be designated Kyler's primary residential parent, that Father be ordered to pay child support, and that Father be allowed reasonable visitation.

The case came on for mediation on March 29, 2005, and, thereafter, an order was entered whereby it was agreed that Kyler was Father's biological child and that the child's name should be changed to Kyler James Griffin–Hodson. The order also set forth a *pendente lite* visitation schedule for Father and ordered that Father pay two *pendente lite* child support payments, each in the amount of $400.

A final hearing in the case was held on April 20, 2005, and after presentation of evidence and argument of counsel, the trial court entered its judgment decreeing that Mother be the child's primary residential parent and that Father have regular visitation as specified. Father appeals this judgment.

## II. Issue

■ The sole issue presented in this appeal is whether the trial court erred in awarding primary parental responsibility to Mother.

## III. Standard of Review

■ In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R.App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn.1999). The trial court's conclusions of law are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

■ As the Tennessee Supreme Court has stated, the paramount concern in a child custody case is the welfare of the child. *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001). As the Supreme Court has further noted, "the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Id.* at 85 (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn.Ct. App.1973)). Appellate courts will not interfere with a trial court's custody decision unless it is shown that the trial court exercised its discretion in an erroneous manner. *Koch v. Koch,* 874 S.W.2d 571 (Tenn.Ct.App.1993).; *Mimms v. Mimms,* 780 S.W.2d 739, 744–745 (Tenn.Ct.App. 1989).

■ Under the abuse of discretion standard, the ruling of the trial court "will

be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *State v. Scott,* 33 S.W.3d 746, 752 (Tenn.2000). A trial court does not abuse its discretion unless it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999). Under the abuse of discretion standard, the appellate court is not allowed to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998).

## IV. Analysis

■ In a child custody case, the trial court is required to determine which of the parents is comparatively more fit to have primary residential responsibility of the child. *Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn.Ct.App.1996). Statutory guidance in making that determination is provided by T.C.A. § 36–6–106 which states that "[t]he court shall consider all relevant factors." This statute further sets forth specific factors to be considered, including the following:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . .

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Our review of the following findings of fact and conclusions of law incorporated by the trial court into its final judgment confirms that the trial court considered all of the factors delineated above that were relevant under the circumstances of this case:

Father bases his request for being the primary residential parent upon mother's "vulgar language". T.C.A. 36–6–106(a) sets forth the factors for the court to consider. Mother has of course been the primary residential parent to date pursuant to T.C.A. 36–2–303 [1]. The court must determine what is in the child's best interest and must use the comparative fitness test in reaching its conclusion.

1. T.C.A. § 36–2–303 provides that "[a]bsent an order of custody to the contrary, custody of a child born out of wedlock is with the mother."

## WILLINGNESS OF EACH TO ENCOURAGE/FACILITATE CLOSE RELATIONSHIP WITH OTHER PARENT

Mother has thwarted father's attempts to have contact with the child until the mediation when a temporary visiting schedule was agreed upon. Mother is an older woman scorned. Neither party has acted maturely in the court's estimation. Father broke all ties with mother when he learned of the pregnancy. He came back into her life two to three weeks prior to Kyler's birth. The parties failed to communicate their feelings with each other. Father was interested in forming a bond and relationship only with Kyler. Mother was interested in forming a bond and relationship with father as evidenced in her becoming upset that father worked and went to school rather than staying at the hospital with her after Kyler's birth. From that point, the relationship between the parties and father's mother deteriorated to the point that both parties should be embarrassed for their immature actions. Namely, father and mother became embroiled in a shouting and cursing argument over the telephone moments before mother's and Kyler's release from the hospital. Mother was agitated that father had spent time with his father on "family business" that day rather staying at the hospital. Father insisted that he would show up at mother's apartment to see Kyler and to let his father see Kyler. The hospital was "locked down" due to father's statements and mother began her course of unreasonable conduct in threatening to call the police and in fact calling the police on other occasions.

It is apparent to the court that mother wished to control father by using Kyler as the bait. She admitted telling father that Kyler wasn't his child, that he wouldn't see Kyler, that he would pay child support and that father would go to jail if he came to her home. She did in fact call the police to her home on two occasions which was unnecessary and totally inappropriate. Her two other children are old enough to remember officers coming to their home and this can be a traumatic event for children. Reasonable, mature adults do not "call the police" on each other.

Mother wasn't a "happy camper" when she took Kyler for the DNA testing. Her demands were taken by the lab technician as excessive. However, the court doesn't understand why it is the lab's policy to not let both parents go back with the child, and the court understands why mother would become agitated when required to hand over Kyler to either the phlebotomist or father.

Mother has made errors in judgment in preventing father from having contact with child. It is in Kyler's best interest to bond with his father and to have as much contact as possible with his father. Mother appears to now be repentant. She acknowledged that she had erred in some respects and she stated that father should have overnight visits with Kyler when Kyler was nine months old.

## CHARACTER AND BEHAVIOR OF OTHERS FREQUENTING PARENTS HOME

This factor appears not applicable here other than father lives with his mother and the maternal grandmother frequents her daughter's home. Both grandmothers are fit and appropriate persons and are of no threat of harm to the child.

## EVIDENCE OF PHYSICAL/EMOTIONAL ABUSE TO CHILD, PARENT OR OTHER PARENT

There is no evidence of same by either party unless one stretches mother's ac-

tions in preventing contact to say mother emotionally abused father thereby.

## CHILD'S PREFERENCE

This factor is not applicable

## HOME, SCHOOL AND COMMUNITY RECORD OF CHILD

Kyler is not quite four months old. He has thrived in mother's home with his two older half-siblings.

## MENTAL AND PHYSICAL HEALTH OF PARENTS

Mother has received workers' compensation for a back injury for approximately a year. Yet, she has taken care of three children and has family resources, including an aunt and mother, to assist her when needed. Father has taken Zoloft for years for "hereditary depression" according to his mother. This does not preclude him from parenting Kyler in the court's opinion. Mother testified father drinks alcohol excessively but there was no corroboration and no substantiation of this allegation.

## STABILITY

Mother has a stable unit consisting of herself and her three children. Father lives with his mother but plans on obtaining his own residence sometime in the future.

## IMPORTANCE OF CONTINUITY IN CHILD'S LIFE AND LENGTH OF TIME CHILD HAS SPENT IN STABLE/SATISFACTORY ENVIRONMENT

Child has resided with mother and his two siblings for the duration of his short life. Mother should have permitted father to have contact on a regular basis with child. Otherwise, the environment she has provided has been satisfactory.

## DISPOSITION OF PARENTS TO PROVIDE CHILD WITH NECESSARIES

Either parent can provide for the child. Although mother has not worked for a year due to a back disability, she expects to be released by her doctor soon. Mother paid father back for the monies he loaned her obtaining housing. There was no showing that she could not provide child with the necessaries.

## LOVE, AFFECTION AND EMOTIONAL TIES BETWEEN PARENTS AND CHILD

Father is only beginning to have contact with child. This was accomplished by the mediation. The photographs taken in April show father lovingly holding his child. Mother's ties are of course greater because she has cared solely for child and breast-fed child until recently.

After considering all of these factors, the trial court concluded as follows:

Both parents are comparatively fit. It is in child's best interest to be with mother who is older and has two other children. Father has had no experience in parenting a child. Mother appears repentant for her unreasonable actions.

Father's argument that he, not Mother, should have been awarded primary parenting responsibility is based upon allegations that Mother sought to prevent him from having a relationship with Kyler. This argument relates directly to subsection (10) of T.C.A. § 36–6–106 whereby the court is required to consider "the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. . . ." Father apparently contends that the trial court gave inadequate consideration to this factor and instead based its decision on the now abolished "tender years doctrine" pursuant to which it was presumed as a mat-

ter of law that a child of a very young age should be placed in the custody of the mother.

First, we are compelled to observe that the trial court makes no reference to the tender years doctrine, either directly or by implication, and there is nothing in the record to indicate that the trial court's decision was governed by the presumption with which that doctrine is identified. We find absolutely no evidence that the trial court based its decision upon the tender years doctrine, and Father's argument to that effect is without merit.

Father makes various references to the record to support his argument that Mother's unwillingness to facilitate and encourage a close relationship between himself and his son should have precluded her from being awarded primary residential custody. For example, Father notes Mother's admission at trial that she told Father she would "fight to her death before he ever got this child and that he could never take the child anywhere." Father further notes, *inter alia,* Mother's admission that she cursed Father on the phone and told him "that he could forget any involvement in [Kyler's] life" and that she told Father "that it didn't matter what [Father] did he didn't have any rights to this child." Father also references the trial court's specific findings that "Mother has thwarted father's attempts to have contact with the child until the mediation when a temporary visiting schedule was agreed upon"; that "Mother wished to control Father by using Kyler as the bait"; and that Mother's calls to the police on two occasions when Father came to her home were "unnecessary and inappropriate."

While the record confirms the trial court's finding that Mother has, in the past, attempted to thwart Father's relationship with Kyler, there is no evidence that Mother has interfered with that rela-tionship since mediation. Mother testified regarding the change in the parties' interactions after mediation as follows:

Q. All right. Okay, after you got home from the hospital, were there, did there continue to be some problems or some things that you weren't comfortable with that occurred?

A. Yes, just, I mean, [Father] calling and cursing and yelling and I kept telling him, you know, if you could talk to me in a calm manner you could see [Kyler] everyday [sic].

Q. Okay. And was he able to do that, though?

A. No.

Q. All right. Now, was there a point that things kind of leveled after a couple of weeks or so when you all started to talk again or, or when did you next, when were you next able to communicate?

A. When we went to mediation.

Q. Okay. And at mediation you all worked out a visitation schedule? Is that right?

A. Yes.

Q. And tell the Court about what that was?

A. He would just get him, you know, every few days for like two hours at a time, since I was breast-feeding.

Q. Okay. And how did that go? How have the visitations gone?

A. They went okay, but he would pick him up on time and bring him back about ten or fifteen minutes late.

Q. But all in all they went okay?

A. Yeah. Yeah.

Q. You don't really have any concerns at this time? Is that right?

A. Yeah.

. . .

Q. Tell the Court your philosophy about the father's involvement in the child's life at this time?

A. Very little. I mean, he doesn't know him.

Q. I mean, from this point forward, what do you want it to be?

A. Oh yeah, I want him to be a big part of it. I mean, I want them to have a very good relationship.

Q. Okay. Do you feel like you all have a better understanding about this situation now that you've gone through mediation?

A. I do.

The trial court acknowledged Mother's "errors in judgment in preventing father from having contact with child." However, the trial court found that "Mother appears to be now repentant." As we have noted above, considerable deference must be accorded factual findings based upon witness testimony. The trial court observes the manner and demeanor of the witness and is in the best position to evaluate his or her credibility. *Union Planters Nat'l Bank v. Island Mgmt. Auth.*, 43 S.W.3d 498, 502 (Tenn.Ct.App.2000). Whatever Mother's conduct may have been in the past, the trial court's finding indicates that such conduct will not recur in the future, and the evidence does not preponderate to the contrary.

Our review of the record convinces us that the trial court gave careful attention to the proof presented and reached its decision after appropriate analysis of such proof in the context of all relevant factors, including those set forth at T.C.A. § 36-6-106(a). The trial court found that, while both Mother and Father are comparatively fit, Kyler has resided with Mother since he was born, and Mother has provided a stable and satisfactory environment for the child and he has thrived in her home. The trial court further noted that Mother is older than Father and has two other children, the necessary implication being that she is more experienced in caring for children than Father. While we have no reason to question Father's ability to care for his child, the factors considered by the trial court in awarding primary parenting responsibility to Mother are relevant and sufficient to support that decision. There is no indication that the trial court's decision in this case constituted an abuse of discretion.

## V. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed, and this cause is remanded for collection of costs below. Costs of appeal are assessed to the appellant, Kenneth Hodson.