IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 12, 2018 Session

## LINDSEY BAILEY HARMON (JEAN) v. RICHARD BRADLEY HARMON

Appeal from the Circuit Court for Shelby County
No. CT-001670-13     Mary L. Wagner, Judge

_____

No. W2017-02452-COA-R3-CV

_____

Mother/Appellant sought to relocate from Memphis, Tennessee to Chattanooga, Tennessee with the parties' minor child. Father/Appellee opposed the relocation. The Circuit Court for Shelby County granted Father's petition in opposition of the relocation, finding that (1) the parties were spending substantially equal time with the child, and (2) the proposed relocation was not in the child's best interest. From this decision Mother appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

Mitzi C. Johnson, Collierville, Tennessee, for the appellant, Lindsey Bailey Harmon (Jean).

Sharon G. Lichliter, Germantown, Tennessee, for the appellee, Richard Bradley Harmon.

## OPINION

### Background

This is a post-divorce parental relocation case. Lindsey Bailey Harmon (Jean) ("Appellant" or "Mother") and Richard Bradley Harmon ("Appellee" or "Father") divorced in 2013 after having one child together, Bailey Kate Harmon ("the child" or "B.K."). The child was approximately two and one-half years old at the time the parties divorced. A permanent parenting plan was entered designating Mother the primary residential parent and allocating her 209 days per year with the child. Father was allocated 156 days with the child. Under the parenting plan, Father was to have the child

Thursday through Saturday of every week; every other weekend, Father would also keep the child through Sunday. Mother and Father both lived in Memphis, Tennessee at the time, and by all accounts the parties worked well together co-parenting and splitting their time with the child for the first several years after their divorce. Because Father's employment required extensive travel, Mother and Father would often deviate from the parenting plan in order to accommodate the child and one another's schedule.[1] Both Mother and Father have always been extensively involved in the child's life and activities.

Both Mother and Father remarried in 2015. Mother married Dr. Robert Jean ("Step-Father") and Father married Lyndsey Williams Harmon ("Step-Mother"). Since these subsequent marriages, both Step-Mother and Step-Father have also become involved in the child's life, and the record reflects that both step-parents have a healthy relationship with the child. Step-Mother in particular is quite close with the child and even coaches the child's soccer team. Father's and Step-Mother's families both reside in the Memphis area, while Mother's family primarily resides in Knoxville. Step-Mother has a large extended family with whom the child spends extensive time. Both Mother and Father have since had new children with their respective spouses, such that the child has a half-brother and a half-sister. It is undisputed that she is attached to and has formed a bond with both of her half-siblings.

All parties agree that in general, both families cooperate with one another to co-parent the child. Mother, Step-Father, Father, and Step-Mother all regularly attend the child's athletic and cheerleading events, and both Mother and Father make an effort to attend field trips, school parties, and lunches with the child. Both families often attend the child's events and interact with one another with no issue. No one disputes that the child is happy, well-adjusted, and enjoys a loving relationship with both families.

Prior to January of 2017, the parties would deviate from the parenting plan in order to accommodate one another, often by "trading" days with one another, or would allow one another to take the child on special trips or vacations regardless of the parenting plan's requirements. In January of 2017, however, the parties came to the conclusion that stricter adherence to the parenting plan would be in the child's best interest, as the constant trading back and forth seemed to be tiring the child and upsetting her weekly routine. While the parties would still occasionally trade days after January of 2017, they primarily adhered to the parenting plan. Mother's 209 days under the plan amounts to roughly 57% of the child's time, while Father's 156 days of parenting time amounts to 43% of the child's time. This arrangement worked well for the parties for a time.

---

[1] Father has since changed jobs and is not currently required to travel for work.

Tension arose, however, on August 13, 2017, when Mother informed Father that Step-Father was offered a job opportunity in Chattanooga that he intended to accept. Step-Father is a successful surgeon, and the Chattanooga job afforded him a much higher salary, better retirement and insurance benefits, and a large bonus that would go towards his student loans. Additionally, Mother and Step-Father wished to relocate because most of Mother's family resides in Knoxville, and it was Mother's desire to be closer to her own family in East Tennessee. In informing Father of the relocation, Mother indicated that it was her intention to take the child with her, but that Mother would continue to help facilitate the child's relationship with Father and Step-Mother.

In response, Father filed a petition in opposition to the relocation on August 31, 2017, with the Circuit Court of Shelby County ("trial court"). Therein, Father alleged that the relocation would cause actual harm to the child by essentially ending Father's day-to-day interaction her. Additionally, Father expressed concerns over Mother's recent behavior, noting that "Mother has already been telling the minor child that this move is 'what's best for her life'[,]" and that Mother further told the child "you will see your daddy all the time . . . Chattanooga isn't that far." In closing, Father asked that the trial court deny Mother's request to relocate or, alternatively, name the Father primary residential parent in the event that Mother relocated without the child.

Mother responded on September 11, 2017, averring that "she has and will continue to encourage a consistent ongoing and meaningful relationship between Father and . . . the child." The trial court, however, issued an injunction on September 19, 2017, prohibiting Mother from relocating with the child, barring Mother from further discussing the relocation with the child, and setting a hearing on the matter. The parties engaged in discovery and proceeded with trial on October 30, 2017.

In addition to hearing from Mother, Father, Step-Mother, and Step-Father, various family friends and members of the parties' extended families testified. Testimony began with Father, who explained to the court that while he traveled quite a bit early in the child's life, he recently accepted a job that requires no travel and allows for flexibility in his work schedule. Indeed, Father noted that he could work from home from time to time were a problem to arise with the child. Father also testified that while he and Mother always worked together to share their time with the child, Mother is also quick to remind him that she, as the primary residential parent, is entitled to more time with B.K. Father indicated that on occasions when he sought additional time with the child, the conversations often did not go "smoothly" because "[Mother] wouldn't allow it." On balance, Father expressed that he believed Mother was a good parent to the child and recognized the strong, loving bond between Mother and the child. Father was also adamant, however, that the child's relocation to Chattanooga would detrimentally and profoundly affect his relationship with the child, and that he did not believe the move would be in B.K.'s best interest.

Specifically, Father testified about his great concern that Mother would not fully cooperate in continuing to facilitate a meaningful relationship between Father and B.K. should Mother be allowed to relocate to Chattanooga with the child. In support, Father cited an instance in which Father allowed Mother to take the child to a cheerleading party during one of Father's designated weekends. While Mother was supposed to take the child to the party and promptly return to Father's house afterwards, Mother instead called Father and said that she was taking the child to an event at Mother's church as well. Mother did not return the child to Father for several hours. Father also introduced into evidence an email exchange between him and Mother in which Father informed Mother that he overpaid her in child support for that year, and would be halting payment in the coming months to correct the error. The email Mother sent in response was as follows:

> Per our parenting agreement, you are allowed 156 days each year with [the child], which includes all holidays. So far this year, through October you have had 141 days with her. If you add in November (where you have 14) as it as, that puts your total days for the year at 155 days. Therefore, based on this, you only get her for 1 day in December because I don't want to "overpay" you with too many days with our daughter . . . I would never bring this up or make this an issue if you weren't trying to reconfigure everything for your own benefit . . . [s]o if you want to withdraw your child support, go right ahead. I will just warn you that you will be getting one day in December so you should start thinking about which day you would like to have her.

Based on this exchange and other similar instances, Father testified that he feared Mother would stand in the way of a meaningful relationship between he and the child should the child move to Chattanooga with Mother. Further, Father was distressed at the idea of being unable to attend weekly events for the child, such a cheer practices and school parties. Finally, Father testified at length about the attachment of the child to his parents and his wife's parents, both of whom interact with the child on a regular basis and with whom the child often does activities and spends the night.

Step-Mother's testimony reflected largely the same sentiments as Father. She testified at length about her bond with the child, noting that she has been in the child's life since B.K. was two and one-half years old.[2] When asked about her role in the child's life, Step-Mother testified that she is fully aware that she is not the child's mother, and explained:

> I would say that my role, first and foremost, is to support [the child], whether that's inside or outside of the house, just love on her, be her friend, try to guide her if she has questions that she brings to me. I support [Father]

---

[2] B.K. was six years old at the time of trial.

in his role as a father to her, which I think is an indirect support of her. Physical presence is a big one for us. We try to be as many places we can be in support of [the child]. I mean, I would just say a confidant, if she needs it, when approached. I try to listen and just love on her, is really what it comes down to.

Regarding the child's relationship with her Father, Step-Mother maintained that Father is extremely involved with the child. In support of this contention, Step-Mother noted Father's attendance at nearly all of the child's extracurricular activities, as well as Father frequenting events at the child's school such as a "reader of the week" program, gingerbread house-making, and pumpkin carving. According to Step-Mother, the child relocating to Chattanooga would render Father unable to do many of these day-to-day activities, thereby severely limiting his relationship with B.K. Moreover, Step-Mother testified that her extended family, including parents, siblings, and aunts, uncles, and cousins, all reside in the Memphis area and see the child often. Step-Mother explained that the child is especially close with Step-Mother's parents; Step-Mother's mother takes the child to do activities on a regular basis. Step-Mother also testified about the child's bond with her one-year old half-brother, and stated that "[brother] is B.K.'s shadow at home." Overall, Step-Mother expressed that the child has many loving relationships with the people who are often in Father and Step-Mother's home, and that they enjoy an extremely strong support network that regularly helps in caring for B.K.

Finally, Step-Mother explained that she shares similar concerns as Father regarding Mother's willingness to foster a meaningful relationship between Father and the child should the child move five hours away. While Step-Mother conceded that the parties typically work well with one another to coordinate the child's events and schedule, she also pointed out several occasions in which Step-Mother felt that Mother placed the child in the center of the parties' disputes. For example, Step-Mother recalled an instance in which Mother became quite upset with Father and Step-Mother for dressing the child in an Ole Miss t-shirt, and sent Step-Mother some "pretty bad texts" over the shirt.[3] On a later date, Step-Mother observed the child move an Ole Miss cup out of the camera view while the child was on Facetime with her Mother; Step-Mother testified that she felt that B.K. did this because the child has observed Mother get angry over Ole Miss merchandise in the past. In sum, Step-Mother shared Father's concerns over the child's potential relocation to Chattanooga, and testified that she did not think it

---

[3] Mother is apparently a University of Tennessee fan, while Step-Mother is University of Mississippi, or Ole Miss, graduate. Step-Mother, however, testified that whenever she buys Ole Miss paraphernalia for her son, she also feels compelled to get something for B.K. in order for B.K. to feel included. Step-Mother explained that she thinks Mother sees the Ole Miss merchandise as a personal slight. Father and Step-Mother both testified that they are no longer able to dress the child in any Ole Miss clothing due to how upset Mother becomes.

was in the child's best interest to move considering the child's established routine and strong support network in the Memphis area.[4]

In contrast, Mother and Step-Father both testified to their belief that relocating to Chattanooga would be in the child's best interest, as well as their commitment to ensuring an ongoing relationship between B.K. and her Father. Mother testified at length regarding she and Step-Father's decision to move, averring that it was in the entire family's best interest to be financially stable so that Mother could continue being a stay-at-home mom. According to Mother, Step-Father was particularly interested in the job in Chattanooga because it allowed for an academic appointment, meaning that Step-Father would have the opportunity to teach young surgeons. Further, the new position's health insurance package provided increased behavioral health benefits; because Step-Father has a son from a previous marriage who is autistic and requires fairly extensive services, the new health insurance was an important aspect of the job offer. Moreover, Mother noted that her parents, sister, and brother-in-law all live in west Knoxville, and that part of the decision to move was in order to be closer to them.

Although Mother agreed that the parties sometimes experience tension in coordinating B.K's parenting schedule, Mother was adamant in her belief that the child benefits from a strong relationship with her Father and his family. According to Mother, she often gives Father and Step-Mother extra parenting time when they ask for it, as she recognizes the large role that they play in the child's life. Mother maintained, however, that she has been the child's primary caregiver for most of her life, and that even now she is the one who typically handles routine parenting tasks such as taking the child to the doctor, obtaining school supplies, and packing the child's bag if she is going to a sleepover. According to Mother, her handling of these "mundane" daily tasks is simply because she prefers to play the traditional mother role and stays at home while Father works; thus, it is often easier for Mother to take the child to the doctor or run errands for the child. Mother acknowledged, however, that if she were to ask Father for help with any of these tasks, he would certainly oblige. It was simply Mother's contention that these tasks are part and parcel to her role as a stay-at-home mom.

In response to Father's testimony about the email regarding overpayment of child support, Mother testified that this email was taken out of context, and insisted that there were other phone calls and interactions that led up to the email that were not put forth at trial. Mother did not testify regarding the allegations of becoming angry over the child wearing Ole Miss clothing. Mother did, however, testify to her opinion that Father and Step-Mother also, at times, place the child in the middle of the parties' disputes.

---

[4] The trial court also heard testimony from Father's sister, who spoke to the strong family support network in Memphis and explained to the court that Father's family regularly attends B.K.'s activities, takes her on various outings, and cares for the child overnight.

Specifically, Mother noted a disagreement that occurred over Labor Day weekend in September of 2017. Father had agreed to let Mother take the child to Knoxville for a Labor Day weekend event with Mother's family despite the fact that it was Father's weekend with the child. According to Mother, the child was extremely excited to spend time with her maternal grandparents and cousins. Upon learning about the proposed relocation, however, Father told Mother that he was no longer comfortable allowing her to take the child during his parenting time. Mother testified that she felt this decision was made in poor judgment and out of spite for Mother because of the proposed relocation. Mother also took issue with the fact the Father and Step-Mother had recently taken the child to be evaluated by a child psychologist for purposes of trial without consulting Mother.

In testifying about her relationship with B.K., Mother stated that she and the child share a special bond because the child was born at a stressful time during Mother's life. As Mother explained, the child was born during the economic recession, and Mother and Father were experiencing financial trouble as well as discord in their marriage. According to Mother, being pregnant with B.K. was what motivated her to work through this difficult time. Mother further testified that she has been the most consistent presence in her daughter's life and that she and B.K. enjoy doing a wide array of activities together. Specifically, Mother testified that because she is currently a stay-at-home mom, she is able to frequently attend events and field trips at the child's school. While Mother admits that she has missed events in the past due to being unable to find child care for her younger child, Mother indicated that she is present at virtually all of B.K.'s extracurricular activities. She also testified that on days when the child is technically with Father and Step-Mother, Mother will often pick the child up from school in order to assist Father and Step-Mother.

It was Mother's ultimate assertion that it would be in the child's best interest to relocate to Chattanooga with Mother and Step-Father. Stated simply, Mother was of the opinion that because she has been the child's most consistent care-giver throughout the child's life, separating from the child could not be in B.K.'s best interest. While Mother acknowledged that the child has a strong family support network in Memphis, Mother urged that her family in East Tennessee could easily provide the same support should Mother and Step-Father relocate to Chattanooga. When Mother was asked whether she was prioritizing the happiness of Step-Father over that of the child, Mother testified that in her opinion, the child would be a direct beneficiary if Step-Father were happier and more secure in his employment, as this would provide for a more stable environment for the entire family.

Finally, Mother insisted that she would continue to work with Father in co-parenting the child, and even testified that Father and Step-Mother would be welcome to stay with Mother in Chattanooga anytime they wished to visit. Further, Mother pointed out that she and Step-Father would travel to Memphis at least once a month in order for

Step-Father to visit his son from his first marriage. Ultimately, Mother testified that if the trial court were to deny her request to relocate, she would not accompany her husband to Chattanooga.

Step-Father's testimony largely dealt with the reasons behind the proposed relocation. Step-Father testified that he was unable to advance in his current employment and that there was more opportunity for growth in the Chattanooga position. Moreover, Step-Father was growing increasingly concerned about his job security in Memphis, as the surgery group he was employed with was experiencing large scale financial problems. Overall, Step-Father indicated that the job in Chattanooga offered the family long-term financial stability, as well as improved health insurance for his autistic son.

With regard to B.K., Step-Father testified that he and Mother looked at schools in Chattanooga and intended to send B.K. to an elementary school with an excellent reputation. Further, Step-Father testified that he and the child enjoy a loving, meaningful relationship despite Step-Father's hectic work schedule. Although Step-Father admitted that it took the child quite a while to warm up to him, he testified that he and the child now enjoy one another's company. For example, Step-Father testified that he makes sure to take the child to Sonic one night a week in order to spend one-on-one time with the child while Mother is busy with their youngest daughter. Although Step-Father's work schedule is quite busy, he testified that he attends the child's school events and extracurricular activities whenever feasible.

In addressing the child's relationship with her Mother, Step-Father testified that it is unlike any mother-child relationship he has seen before, and even called the child Mother's "mini-me." According to Step-Father, B.K. "idolizes" her Mother, and "anything that would disrupt that would be . . . very dramatic for [the child]." As such, Step-Father testified that in his opinion the relocation would be in the child's best interest largely because of the importance in continuity in the child's relationship with her Mother.

Following the conclusion of the three-day trial, the trial court entered a detailed order granting Father's petition in opposition to Mother's proposed relocation. This order included two important findings: (1) the parties were spending substantially equal amounts of time with the child, such that a best interest analysis was required, and (2) that relocating to Chattanooga with Mother and Step-Father was not in the child's best interest. Accordingly, Mother was prohibited from moving to Chattanooga with the child. In the event that Mother did move, however, the trial court entered a permanent parenting plan that would designate Father the primary residential parent and allow Mother parenting time. Mother filed a timely notice of appeal on December 12, 2017.

**Issues Presented**

Both the Appellant and the Appellee have designated the following issues for review:

1.      Whether the trial court erred in determining that Mother and Father spend substantially equal amounts of time with the child.

2.      Whether the trial court erred in determining that it was not in the child's best interest to relocate with Mother and Step-Father to Chattanooga.

In his posture as the appellee, Father has also raised the issue of whether he should be awarded his attorney fees incurred in defending this appeal.

## Standard of Review

The trial court heard this case sitting without a jury. Accordingly, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law, and our review is de novo. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)). However, "we are mindful that trial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." **Johnson v. Johnson**, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting **Koch v. Koch**, 874 S.W.3d 571, 575 (Tenn. Ct. App. 1993)). We recognize that "custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility" during the proceedings, and further note that "appellate courts are reluctant to second-guess a trial court's decisions." **Id.**, (citing **Gaskill v. Gaskill**, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). This Court's "paramount concern" is the well-being and best interests of the child at issue, and such determinations necessarily hinge on "the particular facts of each case." **Id.**, citing **Koch**, 874 S.W.2d at 575.

Finally, the trial court's findings on credibility are entitled to great deference on appeal. See **Taylor v. McKinnie**, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. **Franklin Cty. Bd. of Educ. v. Crabtree**, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing **Jones v. Garrett**, 92 S.W.3d 835, 838 (Tenn. 2002)).

## Discussion

The impetus of the present case is Mother's desire to relocate from Memphis, Tennessee to Chattanooga, Tennessee, with the parties' minor child. We therefore begin our analysis with the statutory requirements found in Tennessee's parental relocation statute, Tennessee Code Annotated section 36-6-108. The statute applicable to this case

outlines different approaches to a petition for relocation depending on which parent spends more time with the child. Specifically:

> If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including those factors found in § 36-6-106(a)(1)-(15).

Tenn. Code Ann. § 36-6-108(c) (2017). Thus, under this version of the statute,[5] the threshold question is whether the parties spend "substantially equal" time with the child. *Id.* Where a trial court finds that the parents are in fact spending substantially equal time with the child, a best interest analysis is applied to determine whether or not relocation would best serve the child. *Id.*

In the present case, the trial court determined that Mother and Father were spending substantially equal amounts of time with the child, where the parenting plan provided that Father have 156 days out of every year with the child, and Mother have 209; thus, Father cared for the child approximately 43% of the time, while Mother's time accounted for 57%. On appeal, Mother begins her brief by arguing that the trial court erred in deciding that a 43%-57% time division amounts to substantially equal time, while Father urges that the parties were indeed spending substantially equal time with the child. Accordingly, we first address whether a 43%-57% parenting time split amounts to substantially equal parenting time for purposes of the parental relocation statute.

### I.      Substantially Equal Parenting Time

The Tennessee Supreme Court has explained that the parental relocation statute does not provide a brightline rule as to what constitutes "substantially equal time." *Kawatra v. Kawatra*, 182 S.W.3d 800, 803 (Tenn. 2005) ("Tennessee Code Annotated section 36-6-108 does not define what constitutes 'actually spending substantially equal intervals of time.'"). The *Kawatra* court did, however, provide guidance as to how

---

[5] Section 36-6-108 was amended as of July 1, 2018. *See* 2018 Tenn. Laws Pub. Ch. 853 (H.B. 1666). In particular, the statute now provides that the party seeking relocation must file a petition to approve the relocation and, if a timely response in opposition is filed, "the court shall determine whether relocation is in the best interest of the minor child." Tenn. Code Ann. § 36-6-103(b), (c)(1) (2018). Thus, it now appears that determining whether the parents are spending substantially equal amounts of time with the child is not necessary. This case, however, was initiated and decided in the trial court prior to the effective date of the statute. *Id.* As such, neither party argues that the statute currently in effect is applicable here. We therefore apply the version of the statute in effect at the time the case was initiated.

parenting days should be allocated to each parent, noting that parenting time should reflect "time actually spent" with the child. *Id.* at 803 (further noting that the court should consider whether either parent has interfered with the other parent's time with the child).

Moreover, this Court has previously explained that the following factors should be considered in determining whether parties spend substantially equal time with their child:

> (1) the terms of the applicable custody and visitation orders, (2) the number of days each parent has actually spent with the child or children, (3) whether the parents are using the full amount of residential time provided them, (4) the length of the period during which the comparison of residential time is being made, and (5) the particular exigencies of the parent's circumstances.

*Collins v. Coode*, No. M2002-02557-COA-R3-CV, 2004 WL 904097, at *3 (Tenn. Ct. App. Apr. 27, 2004). Thus, while there is a framework for determining substantially equal time, there is no concrete boundary. It is commonly held, however, that a 40%-60% time split is not substantially equal. *See, e.g.*, *Kawatra*, 182 S.W.3d at 804 (split of 37.8%-62.2% did not allow the court "to conclude that the parties spent substantially equal intervals of time with the child"); *Heilig v. Heilig*, No. E2014-00586-COA-R3-CV, 2015 WL 3654948, at *6 (Tenn. Ct. App. June 15, 2015) ("trial court correctly concluded that a 60%-40% split between the parents does not amount to 'substantially equal' time under the relocation statute."); *Goddard v. Goddard*, No. E2011-00777-COA-R3-CV, 2012 WL 601183, at *6 (Tenn. Ct. App. Feb. 24, 2012) (noting that a 34.7%-65.3% time split is not substantially equal time); *Lima v. Lima*, No. W2010-02027-COA-R3-CV, 2011 WL 3445961, at *7 (Tenn. Ct. App. Aug. 9, 2011) (parents were not actually spending substantially equal amounts of time with children where Mother cared for children 63.1% of time, and Father cared for children 36.9% of the time); *Redmon v. Redmon*, No. W2013-01017-COA-R3-CV, 2014 WL 1694708, at *4 (Tenn. Ct. App. Apr. 29, 2014) (noting that it was undisputed that the parties did not spend substantially equal time with the child where the time split was 30%-70%).

Here, both parties produced evidence at trial showing the number of days per month spent with the child in the twelve months leading up the hearing. Namely, both Mother and Father introduced calendars from December 2016 – October 2017 reflecting which parent had the child on any particular day. The parties also testified that they generally followed their original parenting plan that was entered in 2013. Under that plan, Mother had the child for 57% of the time, while Father's time accounted for 43%. Although Mother and Father both testified that they would occasionally swap or give extra days to one another, all accounts reflect that the parenting plan was, for the most part, adhered to.[6] As such, the trial court found that any discrepancies between the two

---

[6] The plan also provided for joint decision making in all four of the major areas: education, non-

sets of calendars was negligible, and went on to conclude that the parties were exercising substantially equal time:

> The Permanent Parenting Plan Order entered on July 17, 2013 provides Mother with 209 days and Father with 156 or 57% to 43% split. Both parties agreed that prior to January 2017, they did not follow the Parenting Plan schedule. Instead, immediately after the divorce they began negotiating parenting time on a month-to-month basis. Mother, however, always received more days than Father in the process. But, Father always had his allotted number of days and exercised more at times. This all occurred while Father was traveling for work, which he is no longer doing. . . . Mother's calendars reflect . . . a 56.6% - 42.4% split . . . Father's calendars reflect . . .[a] 54.3% - 45.7% split. . . . Moreover, both parties agree that for 2017 they were following the parenting plan which provides a 57%-43% split and that in the months prior to that, they were exercising more time for Father. Considering all of this, the Court finds the parties to be exercising substantially equal time.[7]

In rendering this decision, the trial court relied on a case involving the same 43%-57% allocation of parenting time. *Monroe v. Robinson*, No. M2001-02218-COA-R3-CV, 2003 WL 132463 (Tenn. Ct. App. Jan. 16, 2003). In *Monroe*, the trial court granted the father's petition to prevent his child's mother from moving out of state with the child. *Id.* at *1. On appeal, the mother argued that the trial court erred in concluding that the parents spent substantially equal amounts of time with the child, because she cared for the child more than Father. This Court, however, disagreed, noting that "the time spent with the child is not exactly equal because exactly equal is almost an impossibility." *Id.* at *4. Moreover, we pointed out that during the trial, both mother and father testified that they had "pure joint legal and physical custody of the children[,]" and that both parties admitted that they generally spent the same amount of time with the children. *Id.* Ultimately, this Court concluded that the evidence did not preponderate against the trial court's finding that the child was spending substantially equal intervals of time with both parents. *Id.*

Notably, the *Monroe* court also stated that the relocation statute "does not require that the time be exactly equal, nor does the provision set any concrete perimeters as to what qualifies as substantially equal." *Id.* Rather, we noted that "the statute has left the determination of what constitutes substantially equal within the discretion of the trial judge." *Id.* This Court has recently reaffirmed the principle that trial courts have discretion in determining whether a particular schedule constitutes substantially equal

---

emergency healthcare, religious upbringing, and extracurricular activities.

[7] Notably, the 57%-43% time split adopted by the trial court was the division of time most generous to Mother.

time. *See **Gensmer v. Gensmer***, No. W2017-00443-COA-R3-CV, 2017 WL 5952918, at *7 (Tenn. Ct. App. Nov. 30, 2017), *perm. app. denied* (Tenn. Mar. 19, 2018) (quoting ***Monroe***, 2003 WL 132463, at *4).

Mother now argues on appeal that the trial court's reliance on ***Monroe*** is erroneous, as subsequent Tennessee caselaw purportedly calls its holding into question. Specifically, Mother asserts that the Tennessee Court of Appeals adopted a more limited definition of "substantially equal" in ***Collins v. Coode***, No. M2002-02557-COA-R3-CV, 2004 WL 904097 (Tenn. Ct. App. Apr. 27, 2004). According to Mother, this limited definition was reaffirmed by the Tennessee Supreme Court in ***Kawatra***, in rejection of the ***Monroe*** decision. *See generally **Kawatra v. Kawatra***, 182 S.W.3d 800, 803–04 (Tenn. 2005).

Respectfully, we disagree. A short discussion of ***Collins*** is beneficial. Indeed, ***Collins*** at first blush appears highly analogous to the present situation as the parties' parenting plan likewise called for a 43%-57% time split. 2004 WL 904097, at *4. However, the trial court, in its discretion, determined that father's actual time spent with the children only amounted to 33.2% because father declined to exercise many of his allotted parenting days. *Id.* The trial court further determined that this was not a substantially equal allocation of parenting time. *Id.* In reviewing the trial court's decision, the ***Collins*** court defined the term "substantially" as "'essentially,' 'to all intents and purposes,' or 'in regard to everything material.'" *Id.* at *3. Under this standard, we affirmed the trial court's ruling that the parties in ***Collins*** were not spending substantially equal time with their children. *Id.* Because of this language from ***Collins***, Mother avers that ***Monroe*** is no longer applicable, and that the facts of the current case cannot satisfy the definition put forth in ***Collins***.

It is imperative to note, however, that even while ***Collins*** provides a helpful definition of "substantially equal," this court in ***Collins*** also held that a determination regarding substantially equal time is, "in the first instance, **the trial court's prerogative**." *Id.* at *3 (emphasis added). "[A]s convenient as a brightline rule might be . . . custody decisions, by their very nature, are inherently fact dependent. Court's must have the flexibility to consider parents as they find them." *Id.* Consequently, nothing in the ***Collins*** decision suggests that a trial court is not afforded broad discretion in determining what amounts to substantially equal time. Moreover, ***Collins*** involved an actual allocation of parenting time that is far less equal than that at issue in this case or in ***Monroe***. *See id.* at *4. Regardless, both cases affirmed the decision of the trial court, finding no abuse of the trial court's discretion. *Id.* at *3; ***Monroe***, 2003 WL 132463, at *4. As such, ***Collins*** and ***Monroe*** can be read in harmony, as both cases acknowledge the discretion of a trial court in determining "substantially equal" time. *See **Monroe***, 2003 WL 132463, at *4 ("The statute has left the determination of what constitutes substantially equal within the discretion of the trial judge."). Indeed, ***Collins*** reiterates what the ***Monroe*** court initially concluded, that there simply cannot be a brightline rule

for determining if parents are exercising substantially equal time, as such a concrete boundary is inappropriate for custody matters.

Mother's reliance on **Kawatra** is even more perplexing, as the issue in that case was not whether an allocation of days similar to that found in this case constituted substantially equal time, but how to determine the proper allocation of days to each parent. *See Kawatra*, 182 S.W.3d at 803–804. Here, the trial court chose to allocate the child's time in a 57%-43% split, crediting Mother with the more generous amount of time that she favored, rather than Father's contention that he spent even more time with the child. In addition, Mother has not argued on appeal that the evidence in the record preponderates in favor of finding that Mother spent additional time with the child beyond the 57% allocated by the trial court. As such, Mother's reliance on **Kawatra** appears misplaced.

Simply put, neither **Collins** nor **Kawatra** suggests that in a case such as the one now before this Court, in which the time split between parents is somewhat narrow, the trial court is required to find that only exactly equal amounts of time are "substantially equal." Indeed, the definition offered in **Collins** states that "substantially equal means . . . in regard to everything material." 2004 WL 904097, at *3 (citation omitted). It appears to us, after thoroughly reviewing the record, that the trial court indeed rendered its decision based on "everything material"; specifically, the trial court heard rather lengthy testimony from both sides regarding how the child allocated her time between Mother and Father and how the parties allocate their parenting responsibilities. Although Mother maintains on appeal that the parties did not spend substantially equal amounts of time with the child, she insisted at trial that she was always more than generous in offering Father extra time in addition to what was mandated by the parenting plan. Mother cannot have it both ways in order to position herself favorably in this appeal.

Considering all of the foregoing, we cannot say that the trial court erred in finding that Mother and Father exercised substantially equal parenting time with B.K. In this particular case, a 43%-57% parenting time split amounts to substantially equal time, especially in light of Mother's concession that Father often exercises more time than is allocated to him under the parenting plan. Accordingly, the trial court's finding that Mother and Father were exercising substantially equal time with the child is affirmed, and we shift our attention to whether the proposed relocation would further the best interests of the B.K.

## II. Best Interest

Upon a finding that parents are spending substantially equal intervals of time with their child, the trial court must then consider whether the proposed relocation is in the child's best interest. Tenn. Code Ann. § 36-6-108(c) ("If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to

move with the child . . . [t]he court shall determine whether or not to permit relocation of the child based upon the best interests of the child."). Under the version of the statute applicable to the present case, the court considers the following factors in undertaking its best interest analysis:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a

qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

Here, the trial court made detailed findings applying each best interest factor to the facts of this case. On appeal, Mother essentially argues that the trial court failed to consider the evidence in its entirety and suggests that the ruling reflects an unwarranted bias against Mother; accordingly, Mother avers that the findings underpinning the trial court's best interest analysis are erroneous. Father, however, argues on appeal that the trial court's best interest analysis was sound. In support of his position, Father avers that Mother has failed to satisfy her burden on appeal by demonstrating how the trial court's actions amount to "an erroneous exercise of the trial [court's] discretion[,]" and further notes that the trial court's decision was in part based upon credibility findings. *See*

- 16 -

*Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App. 1989) (noting that the trial judge's opportunity to see, hear, and evaluate the parents creates a substantial advantage over the appellate court).

Father is correct in noting that trial courts are afforded broad discretion in child custody determinations. *See* ***Johnson v. Johnson***, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) ("Because custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility . . . appellate courts are reluctant to second-guess a trial court's decisions.") (citation omitted); ***Koch v. Koch***, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993) (the appellate courts will not interfere in a child custody determination "except upon a showing of erroneous exercise" of the trial court's discretion). Keeping in mind this deferential standard, we shift our attention to a review of each of the best interest factors as applied to the present case.

With regard to the first factor, addressing the nature of each parent's relationship with the child and the extent to which one parent has been the child's primary caregiver, Tenn. Code Ann. § 36-6-106(a)(1), the trial court stated as follows:

> Both parents have a loving and active relationship with B.K. While Mother has technically performed the majority of the parenting responsibilities, the Court, as discussed in more detail above, does not find that it comes from Father's unwillingness or inability. In a large part, it stems from Mother's desire to be in control and insistence upon performing a "traditional Mother role." To some extent, Mother has even prevented Father from taking on responsibilities. The Court believes that both parents jointly parent. This active parenting by both parents has been a positive and constant factor in this child's life. It has allowed her to thrive. This stability is threatened by Mother's decision to move.

We agree with the trial court's finding that both Mother and Father have a loving and involved relationship with the child. All of the trial testimony supports this finding, and no one disputes that both parents enjoy a healthy, meaningful bond with the child. Indeed, even Mother admits that the child's relationship with her Father is extremely important, and will continue to be important as the child grows. We further agree with the trial court that the proposed relocation threatens the stability of the child's close relationship with Father.

However, the child's strong relationship with her Father and his family does not undercut the fact that here, Mother has unquestionably been the primary caregiver for most of the child's life. Father candidly admitted at trial that up until recently, he traveled often for his job and that Mother primarily cared for the child while he was away. Although we agree that Father's somewhat more limited role in the child's day-to-day care is certainly not the product of his lack of desire to parent the child, it appears that

this arrangement was generally agreed to by the parties since the child's birth. Moreover, while Mother has sometimes insisted on performing her role as primary residential parent even during Father's parenting time, such as in taking the child to doctor's visits or bringing the child necessary items, Mother explained that she offers to perform these tasks because she does not work, rather than as a slight against Father. On the whole, the record in this case reflects that Father currently spends a substantial amount of time with the child and enjoys a stable relationship with her. Because Mother has undoubtedly performed the majority of the parenting responsibilities relating to the care of the child, we find that this factor favors Mother. Tenn. Code Ann. § 36-6-106(a)(1).

The second best interest factor primarily asks us to consider whether each parent is willing and able to "facilitate and encourage" a close relationship with the other parent. Tenn. Code Ann. § 36-6-106(a)(2). Here, the trial court made the following findings:

> The Court fully believes that each parent is equally capable and willing to perform parenting responsibilities. The Court has concerns about Mother's ability and willingness to encourage and facilitate a relationship between Father and B.K. The Court recognizes Mother and [Step-Father's] invitation to Father to visit B.K. and stay in their home any time he wants. That, however, does not encourage and facilitate the strong and constant relationship that Father and B.K. have now or the relationship B.K. has now with extended support network in Memphis. This Court's concern in this regard is caused by multiple factors. One is Mother's desire to serve in a "traditional Mother role." While this may work in her relationship and division of labor with [Step-Father], it is not a role that Father has accepted nor must be relegated to. In fact, Father has shown the exact opposite and been an active and engaged parent. Additionally, Mother has willingly placed the child in the middle of disputes between the parties to the detriment of the relationship between Father and B.K. . . . Also she has threatened to relegate Father to one day for an entire month when he raised a question about child support. Further, Mother refers to Father's parenting time during the week as an interruption, as if a parent's time with a child is an annoyance or inconvenience. For all of these reasons, the Court has concerns about Mother's willingness to facilitate and encourage a close and continuing relationship between Father and B.K. at a distance. This is a significant concern to the Court. The Court does not have any similar concerns with regard to Father.

This Court agrees that both parents are fully capable of performing all necessary parenting responsibilities. We cannot agree, however, with the trial court's finding that Mother's desire to serve in a traditional maternal role somehow adversely affects the child's relationship with her Father. Although the trial court seems to have taken issue with Mother's decision to play this role, as is reflected at multiple points in the final

- 18 -

order, the record simply does not support a finding that this choice harms the child or her Father in any way, nor is it a point of tension between any of the parties.[8] We thus feel compelled to note that the evidence preponderates against the finding that Mother's decision to be a stay-at-home mother somehow raises a concern that she is unwilling or unable to facilitate a relationship between Father and the child.

We must also point out that despite the trial court's finding, Mother did not testify that Father's parenting time is an "interruption" to the child. Rather, Mother testified that she and Father decided to adhere to their parenting plan in January of 2017 because the constant going back and forth seemed to be tiring the child. Specifically, Mother testified that the child sometimes does not enjoy going back and forth because it "[i]nterrupts her week." While Mother seemed to be noting that the hectic schedule sometimes wears on the child, Mother did not characterize Father's parenting time itself as an interruption to the child's life. Accordingly, the evidence preponderates against this finding.

Although this Court acknowledges that not all of the trial court's findings under factor two are fully supported by the evidence, we indeed share some of the trial court's concerns regarding Mother's past behavior. In particular, this Court is troubled by the email exchange in which Mother suggested that she had "overpaid" Father in parenting time with the child. This characterization of valuable parenting time, as if such time can be used as leverage against one another in times of controversy, demonstrates a troubling lack of maturity on Mother's part. If a mere email from Father regarding child support evokes such a strong response from Mother, the Court is concerned that navigating a long-distance co-parenting relationship could be quite difficult for these parties.

Perhaps most importantly, Mother and Step-Father contractually obligated themselves to a move to Chattanooga without consulting Father or ever discussing with him the potential consequences for his relationship with the child. Mother and Step-Father visited Chattanooga, toured elementary schools, and consulted a Chattanooga realtor all without meaningful input from Father. We find this behavior troubling in that it reflects very little concern or regard for Father's relationship and parenting time with the child. While Mother's proposed parenting plan offered Father 138 days of parenting time in the event that the child is allowed to relocate to Chattanooga, Mother's proposed plan also requires that Father and Step-Mother travel to Nashville to pick up the child on their respective weekends, and requires both parties to bear the transportation costs. Thus, Mother sought to place Father in a rather burdensome position without so much as discussing it with him.

---

[8] Father and Step-Mother both acknowledged that before the onset of this litigation, they would often ask Mother to pick up the child from school during Father's parenting time, simply as a favor to Father. By all accounts, this was out of sheer convenience seeing as how Father and Step-Mother both work full-time and Mother is a stay-at-home parent. As such, it seems that Mother's decision to play the "traditional mother role" is, at times, also beneficial for Father and Step-Mother.

Finally, while Mother was adamant at trial that she remains committed to fostering the relationship between B.K. and her Father, the trial court made an express finding that this testimony was not credible. Because Mother has not presented any evidence, much less clear and convincing evidence, that this credibility finding was in error, we do not reevaluate that finding here. *See* ***Franklin Cty. Bd. of Educ. v. Crabtree***, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary). Accordingly, we must conclude that factor two of Tenn. Code Ann. section 36-6-106(a) weighs in favor of Father. While we reiterate that not all of the trial court's findings in regard to this factor are supported by the record, our own review of the record causes us to question whether Mother is prepared to truly "honor and facilitate court ordered parenting arrangements." Tenn. Code Ann. § 36-6-106(a)(2). This concern is buttressed by the fact that nothing in the record suggests that Father exhibits behavior similar to Mother's. As such, factor two militates against allowing the relocation.

The third best interest factor, the parent's refusal to attend a court ordered parent education seminar, is inapplicable to the case at bar. Tenn. Code Ann. § 36-6-106(a)(3). Likewise, the fourth factor, "the disposition of each parent to provide the child with food, clothing medical care, education and other necessary care," is neutral. Tenn. Code Ann. § 36-6-106(a)(4). The record indicates that both Mother and Father are fully capable of providing for the child.

Subsection five of the best interest provision asks the court to consider the "degree to which a parent has been the primary caregiver." Tenn. Code Ann. § 36-6-106(a)(5). Here, the trial court noted that "[b]oth parents have been actively involved with B.K. in many respects[,]" but declined to state which parent this factor ultimately favors. As discussed *supra*, this Court acknowledges that Father is now heavily involved with the child; however, it is clear that Mother has been the primary caregiver for most of the child's life. Indeed, Father testified that at one point before the parties divorced, Father was often traveling Monday – Thursday of each week for work and that Mother almost single-handedly cared for the child during that time. Even following the change in Father's work schedule, the evidence shows that Mother continues to perform the majority of every-day parenting responsibilities, an undertaking that Mother admittedly holds dear. Consequently, we conclude that this factor weighs in favor of Mother. Tenn. Code Ann. § 36-6-106(a)(5).

Turning to factor six, the trial court concluded that the "love, affection, and emotional ties existing between each parent and the child," is neutral and does not favor either parent. Tenn. Code Ann. § 36-6-106(a)(6). Based on our review of the record, we agree. Extensive testimony was offered from both Mother and Father regarding the child's bond with both parents. All of the evidence suggests that Mother and Father both regularly attend events for the child, take her on special outings and trips, and Facetime

and phone the child when she is with the other parent. Both parents have special activities that they do individually with the child; Mother testified that she and the child enjoy doing one another's hair and nails, while Father testified that he and the child go to Tiger's games and play soccer together. Simply put, the record is replete with evidence of the emotional bond between the child and both parents. We thus cannot conclude that factor six favors either party. Tenn. Code Ann. § 36-6-106(a)(6).

In addressing factor seven, which deals with the "emotional needs and developmental level of the child," the trial court found as follows:

> All evidence shows that this is a child who is well developed and mature for her age. No evidence demonstrated any emotional or development needs of the child. The Court is concerned with Mother's willingness to look out for the best interests of the child's emotional needs for several reasons. First, Mother equated the child's happiness with that of [Step-Father]. . . [Step-Father] also equated the child's happiness to that of Mother. It is clear that the child bears the burden of her Mother's emotions. If Mother is not happy or is upset, so is the child. Mother has been willing on more than one occasion to directly place the child in the middle of a dispute between the parents. In addition to placing an undue burden on the child, this discourages and negatively impacts the relationships between the parents and child. Finally, Mother is unwilling to control her emotions regarding trivial matters, to the extent it causes the child to be fearful of her Mother seeing what glass she is drinking from while at Father's home.

Here, we agree that the child in this case has no particular emotional or developmental issues. By all accounts, B.K. is well-adjusted, happy, and thriving. Beyond that, however, we cannot say that we share the trial court's concern that Mother ignores the emotional needs of the child. Both Father and Step-Mother testified that Mother is a dedicated parent and that she loves the child. Although we acknowledge that the incident involving the Ole-Miss paraphernalia is certainly not to Mother's credit, the cumulative evidence in this case simply does not support the finding that Mother fails to "look out for the child's emotional needs."

On the contrary, Mother testified that she makes sure to set aside special one on one time with the child to do activities that the child enjoys doing exclusively with Mother. Moreover, Mother noted at several points in her testimony that she recognizes the importance of the child's relationship with her Father, pointing out that "to be a thriving young lady . . . it's in [the child's] best interest to have the best relationship with her father that she possibly can[.]" With regard to Step-Father, Mother did testify that she is concerned about both the child's happiness as well as her husband's. Indeed, Mother testified that she wants to see "[Step-Father] thrive and be happy because that means our family will be better for it and [the child] is a direct beneficiary of that."

- 21 -

Respectfully, this statement does not "equate" the child's happiness with that of the Step-Father in a harmful manner. Rather, Mother simply suggested that when parents are happy and fulfilled in their own careers, the overall home environment is more stable and children benefit from that stability. These types of statements indicate that Mother generally has the child's best interests at heart, and clearly demonstrates an understanding of what is positive for the child developmentally.

We are cognizant that every divorced couple experiences moments of tension and that children are not immune to those moments. The child may very well recognize when Mother is upset, but the evidence does not support a conclusion that this appreciation of Mother's emotional state is harmful to the child or limited only to Mother. In fact, Father testified that when he initially heard about the proposed relocation, he became visibly upset to the point that the child felt the need to comfort him by giving him a hug and telling him "[d]addy it's ok." Clearly, the child in this case exhibits a high level of emotional maturity and enjoys a close emotional bond with both parents. Such a bond should not weigh against either parent with regard to this factor. Accordingly, we view this factor as neutral. Tenn. Code Ann. § 36-6-106(a)(7).

The eighth best interest factor instructs the court to look to the "moral, physical, mental and emotional fitness" of each parent as it relates their ability to parent the child. Tenn. Code Ann. § 36-6-106(a)(8). Here, the trial court again questioned Mother's emotional fitness:

> No evidence was presented that would challenge either parties moral, physical or mental fitness to parent. The Court does have concern with Mother's emotional fitness. This is based on Mother's need to be in control at all times and Mother's extreme interest in the title "primary residential parent" as a title. The Court is also concerned that Mother described the child as being the only reason to go on during a time of high stress. This is an extremely high burden to place on a child.

Again, we cannot necessarily say that we agree with the trial court's characterization of Mother's testimony. To be sure, Mother did testify at trial that while pregnant with B.K., the parties were facing a tumultuous time in their marriage and were suffering financially. Mother went on to state that due to those stressful circumstances, the child "gave [her] a reason to get up in the morning and keep fighting." According to Mother, she felt the need to "keep it together . . . and . . . establish some consistency and stability for [the family] financially." In our view, this testimony does not establish that the child is burdened by Mother's emotional instability; rather it simply establishes that Mother is motivated by a desire to provide for her children. One can easily surmise that most parents likely share Mother's sentiment. Further, neither Father nor Step-Mother expressed any concern that Mother is emotionally unfit to parent the child. As such, we

cannot find that the evidence supports the trial court's concern over Mother's emotional fitness.

We do, however, agree with the trial court that no evidence reflects any shortcomings in either parent's moral, physical, or mental fitness to parent the child. Tenn. Code Ann. § 36-6-106(a)(8). As discussed at length already, both parents and their respective families clearly care deeply for the child. B.K. is well-cared for in both Mother's and Father's home. Accordingly, factor eight does not weigh in favor of either party.

Turning to the ninth factor of the best interest statute, we now consider the "child's interaction and relationships with siblings, other relatives and step-relatives . . . as well as the child's involvement with the child's physical surroundings, school, or other significant activities." In the trial court's view, this factor carried significant weight due to the child's extensive, established family support network in the Memphis area. Indeed, the trial court noted that:

> [The child] has an extensive family network in Memphis. This includes Father's parents, brother, aunts and uncles and Step-Mother's extended family. It also includes her Godmother. As described above, all are intimately involved in this little girl's daily life. B.K. sees these individuals on a consistent and regularly basis weekly, if not multiple times a week. This will be discontinued if B.K. moves to Chattanooga. B.K. is close to her family on Mother's side. However, it is not the daily or weekly interaction from Father's side of the family. Mother's family regularly visits Memphis. . . .There is nothing preventing them from this continued level of interaction if B.K. remains in Shelby County. Further, Mother will be in Chattanooga with two young children while Step-Father works extensively. While Mother's family will be closer, B.K. will be losing an extensive extended family network that is involved with her and supports her daily. Additionally, while in Memphis should Mother not be able to attend a school event due to lack of childcare, B.K. has another parent and numerous other family members that can easily attend and do.

Here, we conclude that the evidence supports the finding that should the child relocate to Chattanooga, she would be deprived of a significant amount of support. As the trial court pointed out, Father's family and Step-Mother's family both have regular interaction with the child and make a concerted effort to spend quality time with her. Step-Mother's parents live just down the street from Father and visit nearly every day. The child refers to Step-Mother's mother as "Gigi", and the child sees Gigi most days she is at Father's house. Step-Mother's siblings also live nearby and frequent Father's home. Step-Mother's parents share meals with the family on a regular, if not daily, basis.

By all accounts, Father's family and Step-Mother's family regularly attend the child's extracurricular activities, whether it is soccer, cheerleading, or events at the child's school. In that vein, both Mother and Father testified that the child immensely enjoys being on her cheerleading squad and that the child is quite good at soccer. All accounts further reflect that the child enjoys many friends at school, church, and on her various teams. Thus, the child is undisputedly thriving in her current environment, and relocation to Chattanooga would most certainly disrupt that. While Mother maintains that the child is happy by nature and would have no difficulty adjusting to a new environment, Mother also admitted that the child has many friends at her current school and is very social.

We must also note that the child's relationship with her Step-Mother seems to be of great importance in the child's life. As the trial court aptly noted, "Step-Mother loves B.K. as if she were here own[,]"and Father's testimony further reflects that Step-Mother is "one of [the child's] best friends." Step-Mother testified that she views her role with the child as being a special friend and confidante, and Step-Mother even coaches the child's soccer team. Notably, the trial court concluded that Step-Mother's testimony was "highly credible and genuine."

While Step-Father also testified that he has a loving and healthy relationship with the child, it does not seem to rise to the level of the child's relationship with Step-Mother. Although Step-Father indicated that he certainly does his best to spend quality time with the child and attend her events, he necessarily has a very demanding work schedule that would continue in Chattanooga. Moreover, as the trial court noted, Mother and Step-Father simply would not have the same amount of family support if they were to relocate to Chattanooga. Mother's family in Knoxville would be closer, but having a family network an hour and half away is profoundly different than having a network right down the street. As of now, there are always family members available to pick the child up from school, and go to her events, etc., if either Mother or Father is unable to do so. In the event that Mother and Step-Father relocate with the child to Chattanooga, it is unclear that the child would benefit from a similar level of support as she currently receives from Father's and Step-Mother's families.

Consequently, we agree with the trial court that in this particular case, factor nine is especially significant. While it may very well be true that the child would easily adjust to a routine in Chattanooga, uprooting the child from an environment in which she enjoys so much support and so clearly thrives would necessarily have a profound effect on the child. All of the trial court's findings as to this factor are supported by the evidence, and we must conclude that factor nine heavily favors Father.

Likewise, factor ten of section 36-6-106(a) weighs heavily in favor of Father for similar reasons. This factor addresses the "importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment." Tenn. Code

- 24 -

Ann. § 36-6-106(a)(10). The child has lived in the Memphis area all her life and is involved in many various activities in school, church, and sports. As discussed, the child has a healthy, established routine in which many family members contribute to the child's care and support. Because the evidence supports the trial court's findings as to Tenn. Code Ann. section 36-6-106(a)(10), we agree that this factor militates heavily against relocation.

Because factor eleven is not applicable to the case at bar, we therefore turn our attention to factor twelve. Here, we must consider "[t]he character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(12). As applied to this case, factor twelve essentially deals with the character and behavior of Step-Father and Step-Mother and their interactions with the child.

The record reflects that both Step-Mother and Step-Father have a stable, healthy relationship with the child. While Step-Mother seems to spend more time with the child necessarily because of Step-Father's demanding career, the record is devoid of evidence indicating any problems between the child and either step-parent. Tenn. Code Ann.§ 36-6-106(a)(12). As previously discussed, however, the record clearly reflects that the child has a more involved relationship with Step-Mother than she does with Step-Father. Indeed, Step-Mother coaches the child's soccer team and regularly brings her extended family to the child's events. Because the child enjoys such a close, loving relationship with her Step-Mother, we find that factor twelve slightly favors Father. Tenn. Code Ann. § 36-6-106(a)(12).

As factor thirteen is inapplicable, we next address factor fourteen, which deals with each parent's employment schedule. Tenn. Code Ann. § 36-6-106(a)(14). Here, the trial court found this factor to be neutral, noting that each parent's "limitations" in their daily schedules are "similar in scope." Mother, for example, is a stay-at-home mom and thus enjoys some flexibility in her daily schedule. However, Mother testified that she has, on occasion, missed events for B.K. due to a lack of child care for her youngest daughter. On balance, Father testified that he works full-time but has the ability to work from home in the event that the child is sick. Step-Mother and Father, however, also have the "limitation" of having a younger child. Clearly, both families have relatively normal scheduling challenges; however, we cannot say that one parent's schedule is vastly more restrictive or flexible than the others. Accordingly, the evidence does not preponderate against the trial court's finding that this factor is neutral. Tenn. Code Ann. § 36-6-106(a)(14).

Having thoroughly considered the trial court's analysis of the best interest factors as required by Tennessee Code Annotated section 36-6-108(c), we must conclude that the trial court did not err in granting Father's petition in opposition to relocation. In our view, two best interest factors weigh heavily in favor of Mother, while three factors heavily

favor Father. The remaining factors are neutral or do not heavily weigh in favor of either parent. Specifically, the fact that Mother has been the primary caregiver of the child, and the fact that all of the evidence reflects a particularly strong bond between Mother and the child, militate in favor of allowing relocation. On the other hand, Father and the child also enjoy a loving relationship, and the evidence overwhelmingly reflects that the child benefits from being in close proximity to Father, Step-Mother, and their extended families. The amount of support the child receives because of this proximity is significant and unlikely to be replicated should the child relocate to Chattanooga. As such, it is our conclusion that in this particular case, the child's interactions with her current environment, as well as continuity in that environment, outweigh the fact that Mother has been the primary residential parent since the parties' divorce. Moreover, we cannot discount the fact that there are serious concerns over whether Mother would fully facilitate a meaningful relationship between the child and her Father should the child move to Chattanooga with Mother. Tenn. Code Ann. § 36-6-106(a)(2). While the parties tend to be able to successfully co-parent while both residing in the Memphis area, long-distance co-parenting from hundreds of miles away necessarily demands the utmost diplomacy and maturity. Some of Mother's past behaviors do not inspire confidence that she is capable of exercising those traits to the appropriate degree. Accordingly, this factor also militates heavily against relocation.

This case is exceptionally close in that many of the best interest factors are neutral, and this Court has no doubt that the child is well-cared for by both parents. Our decision, however, cannot rest simply on the fact that both Mother and Father are good parents; rather, we are tasked with reviewing the factual findings of the trial court, and determining whether its final decision resulted from the erroneous exercise of the trial court's discretion. Moreover, we have not been presented with any evidence that causes us to question the trial court's finding that Father and Step-Mother were more credible than Mother. Based upon on all of the evidence presented in this case, we cannot conclude that the trial court erred in exercising its discretion when it determined that the proposed relocation was not in the child's best interest. Accordingly, the decision of the trial court is affirmed.[9]

## III. Attorney Fees

In his posture as Appellee, Father has asked this Court to award him the attorney fees incurred by this appeal. *See* Tenn. Code Ann. § 36-5-103(c) ("A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other

---

[9] In her appellate brief, Mother also raised the issue of whether the proposed relocation serves a reasonable purpose. Because we have determined, however, that the parties spend substantially equal time with the child and that the relocation would not be in the child's best interest, we need not reach the issue of whether the move serves a reasonable purpose.

proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order[.]"). The statute "vests this Court with the discretionary authority to award these fees and costs in proper cases." ***Pippin v. Pippin***, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008). Here, we exercise our discretion to decline to award Father attorney fees incurred on appeal.

**Conclusion**

The order of the Circuit Court for Shelby County granting Appellee Richard Bradley Harmon's petition in opposition of relocation is affirmed. This cause is remanded to the trial court for further proceedings consistent with this Opinion and for the collection of costs. Costs of this appeal are taxed to the Appellant, Lindsey Bailey Harmon (Jean), for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE